755 P.2d 1229

**EMPIRE LUMBER COMPANY,**
Complainant,

v.

**WASHINGTON WATER POWER
COMPANY, Respondent.**

**EMPIRE LUMBER
COMPANY, Appellant,**

v.

**WASHINGTON WATER POWER COM-
PANY and Idaho Public Utilities
Commission, Respondents.**

No. 16634.

Supreme Court of Idaho.

July 16, 1987.

On Rehearing May 12, 1988.

Jim Jones, Atty. Gen., Scott D. Woodbury, Deputy Atty. Gen., Boise, for respondent Idaho Public Utilities Comn.

Orndorff & Peterson, Boise, for appellant. Owen H. Orndorff argued.

Paine, Hamblen, Coffin, Brooke & Miller, Coeur d'Alene, for Washington Water Power. R. Blair Strong argued.

SHEPARD, Chief Justice.

This is an appeal from a decision of the Idaho Public Utilities Commission denying a motion for an order directing Washington Water Power Company to enter into a contract with Empire Lumber Company for the purchase of electricity pursuant to the Public Utility Regulatory Policies Act. We affirm.

In 1978 Congress, as a part of the National Energy Act, enacted the Public Utili-

ty Regulatory Policies Act (PURPA), P.L. 95–617, 92 Stat. 3117 (1978). Section 210 of that Act requires electrical utilities to purchase the power produced by co-generators or small power producers which obtain qualifying status under the Act. Pursuant to section 201 of the Act, co-generators or small power producers must meet three criteria to become Qualified Facilities (QF). Those criteria encompass size, fuel, and ownership. Upon satisfaction of those criteria, the owner or operator is required to furnish notice to the Federal Energy Regulatory Commission (FERC). FERC promulgated regulations implementing sections 201–210 of PURPA.

The implementation of PURPA as it relates to co-generation and small power producers, and the regulations promulgated by FERC, have been largely left to the regulatory authorities of the individual states. PURPA, section 210(f), provides in part: "Each state regulatory shall ... implement such [FERC] rule ... for each electric utility for which it has ratemaking authority." The FERC regulation, 18 C.F.R. § 292.401(a) (1980), further provides:

> Such [state] implementation may consist of the issuance of regulations, an undertaking to resolve disputes between qualifying facilities and electric utilities under subpart C (arrangements between electric utilities and qualifying cogeneration and small power production facilities under § 210 of (PURPA)) or any other action reasonably designed to implement such subpart.

The Idaho Public Utilities Commission is the agency authorized and directed to supervise and regulate electrical utilities, and has ratemaking authority over such utilities. I.C. §§ 61–501, 61–129; *Grever v. Idaho Telephone Company*, 94 Idaho 900, 499 P.2d 1256 (1972). The Commission, as part of its statutory duties, determines reasonable rates and investigates and reviews contracts. I.C. §§ 61–502, –503. The Commission also has jurisdiction to hear complaints against utilities alleging violation of any provision of law or of any order or rule

of the Commission. I.C. § 61–612. *See, Afton Energy Inc. v. Idaho Power Company*, 111 Idaho 925, 729 P.2d 400 (1986). Thus, it is clear that the Idaho Public Utilities Commission is granted authority by the Idaho statutes to, and is the appropriate forum to resolve whether a co-generator or small power producer has satisfied the criteria for "qualified facility" status, and to determine whether a regulated utility has an obligation under PURPA to purchase power from an applicant.

In the instant case, Empire Lumber Company has, since the passage of PURPA, investigated the construction of a co-generation plant to produce electrical power for sale to Washington Water Power. Empire has proposed the construction of a facility to burn waste wood products for the production of electrical power at mills at either Kamiah, St. Maries, or Weippe, all of which are within the service area of Washington Water Power. In 1983 Empire purchased used equipment from Crown Zellerbach and retained a consulting engineer for advice as to the development of a PURPA power project. During 1984 and 1985 Empire attempted to negotiate an agreement with Washington Water Power under which Washington Water Power would purchase electric power from Empire. Those negotiations were largely unsuccessful. In June 1985, Washington Water Power presented Empire with a contract proposal, however objections were made to certain terms, *i.e.:*

Section 4 —Terms of Agreement

Section 9 —Liquidated Damages

Section 12—Payments

Section 15—Indemnity Insurance and Performance Bonds

Section 16—Security

The last negotiating session between Empire and Washington Water Power took place on September 15, 1985. On September 23, 1985, Empire filed a complaint with the Idaho Public Utilities Commission requesting that the Commission order Washington Water Power to execute a long-term, fixed-rate contract at the avoided

cost rates.[1] It was not until October 10, 1985, that Empire filed its notice of a 9.9 MW QF at Kamiah, Idaho.

Hearings were held on Empire's complaint, wherein Empire argued that Washington Water Power was required pursuant to PURPA to enter into a contract for the purchase of power from Empire, and Washington Water Power argued that Empire had no specific sized plant or configuration in mind for its project which were required by PURPA, and thus was not ready, willing and able to sign a contract with Washington Water Power. Thereafter the Commission issued its order dismissing Empire's complaint, and concluding that "at no time was Empire ready, willing and able to sign a contract with Washington Water Power." In its order, the Commission stated:

> Implicit in this guideline is the requirement that (Empire) have knowledge of the facility's size and design specifications. While we do not look for virtual completion of a project as a prerequisite to ordering a purchase power contract, substantial progress towards its completion should be evident.

Thereafter, Empire filed a petition for reconsideration which was granted, and a further hearing was held in May 1986. The Commission then issued its further order, again dismissing Empire's complaint. While the Commission discussed rates which must be offered to a QF, the Commission again concluded that Empire had not "perfected its entitlement" to a contract.

The Idaho Constitution authorizes this Court only limited jurisdiction to review orders of the Public Utilities Commission. ID. CONST. art. 5 § 9. I.C. § 61–629 further defines that limited jurisdiction, and this Court has held:

> The Commission is a fact finding, quasi-legislative body authorized to investigate and determine issues presented by a utili-

ty's petition for increased rates. Where its findings are supported by competent and substantial evidence this Court is obliged to affirm its decision. *Boise Water Corp. v. Idaho Public Utilities Commission*, 97 Idaho 832, 838, 555 P.2d 163, 169 (1976); *Application of Pacific Telephone & Telegraph Co.*, 71 Idaho 476, 480, 233 P.2d 1024, 1026 (1951).

*See also Utah-Idaho Sugar Co. v. Intermountain Gas Co.*, 100 Idaho 368, 376, 597 P.2d 1058, 1066 (1979) stating, "[I]n reviewing findings of fact we will sustain a Commission's determination unless it appears that the clear weight of the evidence is against its conclusion or that the evidence is strong and persuasive that the commission abused its discretion." In the instant case, as stated, the Commission held that Empire was at no time "ready, willing and able to sign a contract with Washington Water Power." As aforestated, a co-generator or small power producer must comply with FERC regulations to obtain a QF status. The Commission found that Empire did not file its notice of a QF status under PURPA until October 10, 1985, after Empire had filed its complaint in the Idaho Public Utilities Commission against Washington Water Power. The record before the Commission supports the findings by the Commission that the output of Empire's proposed facility is still an unknown, and that the sizing of the facility is not based upon the capacity or configuration of any known equipment. The Commission concluded that "[A]part from filing a Notice with FERC, Empire has taken no action to acquire, design or construct a 9.9 MW facility." The evidence before the Commission reveals that the feasibility study conducted by Empire in 1984 was concerned with the amount of fuel required for a 3.75 MW or a 5 MW plant at Kamiah, Idaho. The evidence further reveals that prior to the filing of the complaint before the Idaho Public Utilities Commission, Em-

---

1. "Avoided cost" means the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source. 18 CFR § 292.101(b)(6) (4–1–86).

pire had not committed to build a plant of any particular size or capacity. Hence, we hold that the evidence clearly supports the decision of the Idaho Public Utilities Commission that Empire was at no time ready, willing and able to enter into a binding contract with Washington Water Power.

■ We deem it clear that the intent of PURPA is not to require an electric utility company to enter into a contract to purchase electrical power from an entity which in essence only desires to obtain an option to sell some amount of electrical power to be generated at some plant of unknown size or capacity. Such an entity must first become a QF, and in the instant case any concrete facts relating to the proposed generation facility were not known by Washington Water Power during the negotiation process, and such facts, as were defined, became known only following the filing of the complaint with the Idaho Public Utilities Commission. The evidence clearly supports the decision of the Idaho Public Utilities Commission that at no time during negotiations was Empire ready, willing and able to sign a contract with Washington Water Power. The decision of the Idaho Public Utilities Commission is affirmed; costs to respondent.

DONALDSON, BAKES and HUNTLEY, JJ., concur.

BISTLINE, Justice, dissenting.

### I (A)

The first co-generation case in Idaho was *Afton Energy, Inc. v. Idaho Power Co.,* 107 Idaho 781, 693 P.2d 427 (1984). Idaho Power fought strenuously before the Public Utilities Commission, and then in this Court for its views which were adopted by Justice Bakes, and well stated by him in his dissent, *that the Commission did not have jurisdiction and power to order Idaho Power to purchase power from Afton.*[1] He wrote that the "Commission's jurisdiction must stem from state law. The commission has no inherent power, and its powers and jurisdiction derive in their entirety from enabling statutes, and 'nothing is presumed in favor of its jurisdiction....' Afton Energy is attempting to enforce contractual rights granted by federal law ... it is not true ... that the federal statute or regulations can grant jurisdiction to a state administrative agency which has not been given that jurisdiction by the Idaho legislature." 107 Idaho at 790–91, 693 P.2d at 436–37. He "vehemently" disagreed with the Court's opinion which held otherwise, and on rehearing continued to adhere to those views. Justice Shepard on the rehearing stated that he had earlier adhered to those same views, and continued to do so. That the issue was rather hotly contested in this Court is perhaps an understatement, as witnessed by the fact that Justice Shepard openly made the unprecedented move of voting with the majority "solely to the end that should a petition for rehearing be filed I may be able to, and most assuredly will, cast a meaningful vote to grant rehearing." 107 Idaho at 793, 693 P.2d at 439. That is all behind us, and it is much doubted if any court in the fifty states judicially rejected the right of Con-

1. In *Afton,* a newly formed corporation, Afton Energy, Inc., wanted to construct a cogeneration plant in Afton, Wyoming. This plant was to consume waste wood by products and would produce 4.5 MKW of power. After a preliminary feasibility study, Afton started negotiations with first Lower Valley Power & Light, a local utility, then later Idaho Power. A copy of the contract was sent to Afton Energy, but before Idaho Power would sign, it requested letters indicating self-certification from the Federal Energy Commission, waiver of jurisdiction of Wyoming, and power delivery arrangements from local utilities. Several months later Afton returned with the requested documents and a summary of the financing plans. Idaho Power decided not to purchase the power. In an effort to force Idaho Power to contract under PURPA, Afton Energy took its case to the PUC which ultimately ordered Idaho Power to contract with Afton.

Empire Lumber encountered a markedly different response from the PUC when it tried to force WWP to contract in a way similar to Afton and Idaho Power. The PUC in rejecting Empire's claim held it required a QF status, a location for the plant, and a showing of adequate fuel for the facility. Also required was the "implicit" size and design specifications of the plant.

gress to pass such legislation. In today's opinion for the Court Justice Shepard merely mentions the legislation without comment other than that "it is clear that the Idaho Public Utilities Commission is granted authority to, and is the appropriate forum to resolve whether a co-generator or small power producer has satisfied the criteria for 'qualified facility' status, and to determine whether a regulated utility has an obligation under PURPA to purchase power from an applicant." At 192, 755 P.2d at 1230.

In the *Afton* case, Idaho Power's resistance to co-generation was based solely on its objection to the concept of having to deal with such concerns at all. If it raised *any* objection to Afton Energy's qualifications, I do not remember them, and believe that it can safely be said that such was not an issue before the commission or on appeal in this Court. It can also be safely said that co-generation as envisioned by the Congress is becoming a reality in Idaho.

Even while this case has been under consideration, the Idaho Statesman under date of of June 15, 1987, carried an article which informed its readers that there are now at least 85 small Idaho-based producers with 56 contracts to feed Idaho Power, 17 with Utah Power and Light, 11 with Washington Water Power, and one with Pacific Power & Light. What that means is that the commission, as a result of the PURPA legislation, since 1984 had to accommodate at least 85 more cases and probably more. This is a lot of cases when added to the PUC's primary already burdensome task of supervising the rate-making cases of the big public utilities in the state.

The article, to this reader at least, tends to explain the stance taken by the commission in rather summarily dismissing the complaint lodged with it by Empire Lumber, a company which may be no greater or no smaller than Evergreen Forest Products, featured in the Idaho Statesman.

By RANDY STAPILUS
The Idaho Statesman

Snuggled deep in the forest country of Adams County is a key generator of the electric power revolution.

The generator, in a sawmill run by the Evergreen Forest Products Co., uses castoff bark, chips, sawdust and shavings. They are burned to make steam, which turns turbines, which creates electricity—more than five megawatts of it a year, or enough for 1,000 electrically heated homes.

The power plant produces even more juice than its founders had hoped. The electricity goes to, and brings money from, Idaho Power Co.

"That's been a very, very good plant; it really has," said Dick Barrell, a partner in Tamarack Energy Partnership, which assists Evergreen with the power production.

The sales help stabilize the mill's finances, he said. The generator also helps dispose of wood waste, he said. "That has always been a problem."

Small generators such as the one at Evergreen have broader benefits, too, Barrell said. "These small plants can (start operating) much faster than the large plants," he said. And they generally use renewable resources.

However, power generation by such small producers as Evergreen, the first generator to sign a contract with Idaho Power, has created some problems for major utilities.

For many years, utilities would not buy power from small producers. But the Public Utilities Regulatory Policies Act (PURPA), enacted by Congress in 1978, required utilities to purchase the output of small-scale producers. Terms of those purchases are set by—and vary widely among—utility commissions in the various states.

Knowing something about the comparative net worth of Afton Energy, and Evergreen Forest Products, or Empire Lumber Co., and the other 82 or more small power producers would be helpful. Although there are intimations in the commission's order, picked up on by members of this Court, that it is only seeking an "option" to have the right to sell its power to Washington

Water Power, and accordingly is aught but a speculator, neither Washington Water Power nor the commission point to any evidence adduced by Washington Water Power or the commission that Empire is without the substance to get into the business of becoming a small producer of electricity. It rather appears that the word "option" was taken out of context by the commission, and for certain is in the Court's opinion. At page 192, 755 P.2d 1230 the majority writes that "[i]n 1983 Empire purchased used equipment from Crown Zellerback...." What it purchased was a 3.7 megawatt generator. By law it cannot exceed operating a generator producing over ten megawatts. It did not want to foreclose itself from building a plant up to 9.9 megawatts, or possibly 6 or 3.7. The *commission's brief* on page 9 informs all of us justices that Empire had made substantial progress, including expenses of over $200,000 which included the 3.75 megawatt plant form Crown Zellerback. Empire made it quite clear (again from the commission's brief and not Empire's) that it had not been shopping for a 10 megawatt plant, or a 5 megawatt, or two 5 megawatt plants, simply because "negotiations broke down" and "we've got to have a contract before we go out and spend the time and money to locate equipment." Commission's brief, p. 10. At the same page, Empire's response to a commission question asking, "Can I infer ... that you might put in any size plant up to 10 megawatts depending upon what you locate"?, the answer was, "[Yes] depending on how the figures come out." Which makes sense to me, and confirms that all that Empire was saying was that they were keeping their options open as to size. It is basically unfair to suggest that Empire was simply seeking a commitment on rate so that once obtained, it could be peddled—much the same as one buys an option on a house, horse, or farm, and tries to sell it when he is unable to exercise the option, or can't come up with the money.

The issue of location of the mill is a pretext, a red herring. Maybe not to the uninformed reader, but to anyone who knows north Idaho, it would matter little whether the plant was put in operation at Kamiah, at Weippe, or at St. Maries. Anywhere in that region there is an abundance of "cast-off bark, chips, sawdust and shavings" such as the Statesman says are utilized by the Evergreen Forest Products in Adams County, and, I would venture, in greater abundance. Moreover, the commission's brief recites the impasse reached at the September 16, 1985, negotiating session, where there were four items on the agenda, one of which was *"an offer to consider Water Power's preference for a site* (St. Maries, Weippe, or Kamiah)." Negotiations broke down when "Mr. Bryan [for Water Power] took the adamant position that he would not sign the contract at the approved rates.... You cannot negotiate when there is an adamant position on one party's side."

Unlike the situation in *Afton,* Water Power does not have available an attack on the commission's jurisdiction. That issue has been settled.[2] Instead, without bringing in any evidence to show that Empire was not qualified, even though it had qualified with FERC, as noted in Order No. 20281, March 4, 1986, which also conceded that Empire was assured of a fuel supply from wood waste.

That order, dismissing the action, philosophized:

We note Water Power's well publicized commitment to economic development in its service territories. This indicates that the utility and Empire have a common interest in bringing this cogeneration project on line with its attendant boost to

2. As surfaces *infra,* the Idaho Legislature having not passed a PURPA implementing legislation, such as occurred in Oregon, the Idaho Public Utilities Commission has promulgated a complete set of implementing rules, which are not challenged, and will have the force of law when filed in the State Law Library. All of the major electrical utilities doing business in Idaho took part in that proceeding.

employment and general economic stimulation. We encourage both parties to make a concerted effort to negotiate and comprise specific contract terms with the objective of bringing this project to the grid. Until such action is undertaken by both parties, this Commission will not further consider complaints and arguments addressing specific contract terms. Voicing objections and raising concerns does not equate to active negotiation. A Complaint should not be brought to the Public utilities Commission until every effort is made to actively negotiate and conclude a contract.

A rehearing was granted, followed by Order No. 20693 which was essentially a mandate to both parties to resume negotiations in good faith, but cautioning that "This Commission will not approve a contract giving the project owner the option to size capacity for anything up to 9.9. MW." While the order did not clarify with any precision why the commission insisted that there be a fixed capacity plant at the outset, it does serve to explain the context in which it understood itself to be using the word "option" entirely inconsistent with the meaning which to my perception has been ascribed to it at this level.

All that I understand is that federal law restricts the capacity, and it is beyond my understanding why the commission in its final order insists that the size of the plant be specified, and so one would suppose, purchased as a prerequisite showing of good faith.

In sum, it would be helpful to know if the 85 small producers now in operation were similarly required to have a definite commitment to a certain size plant, and why. The commission closes with this passage, which I do not see as explaining its positive requirement of a plant size:

> Dealing dispositively with the unusual testimony and exhibits in this case renders the tone of this Order—necessarily, in our reluctant conclusion—arbitrary, repetitive and didactic. But the reality is that it is the law under which we work that is arbitrary: there are stages that must be reached before we can take jurisdiction over complaint resolution. The Commission is frustrated by a number of indications that *the complainant really was offering siting options to the utility,* and that thus-far unproductive capital expenditures have been made toward the goal of installing a viable co-generating facility of some importance to the economy of the Kamiah area and consonant with PURPA objectives including the utilization of renewable resources. Our frustration is that the steps necessary to constitute full negotiation, as outlined above, can only be taken by the complainant and not by us. Order No. 20693, p. 283.

The key word found above, so I truly believe, is "frustration." A frustrated commission may be expected to act out of frustration. Only in these co-generation cases does it appear that frustration with the parties and their attitudes surfaces. District judges face it much of the time, and have penalized parties for their failure to negotiate settlements when obviously a settlement is in order. But, is frustration with the parties, apparently both of them in this case, a sufficient reason to close the file? Perhaps it is sufficient, but I question its validity, and especially in this case where the very purpose of PURPA is frustrated, and the Kamiah—Weippe—St. Maries area continues to be denied the economic stimulation which would flow from getting this project on line.

My view is simply that frustration, and very likely justified and long-stifled frustration is not sufficient reason for dismissing the complaint. A dismissal is without question a victory for Water Power. Has it prevailed on the merits? No, it has prevailed by thwarting the efforts of Empire to join 85 other Idaho co-generators. A dismissal of an action out of sheer frustration, whether by district court, or by a regulatory body, and maybe more so with the latter, delays, but does not solve. On other occasions the commission has been

more forceful and has the power and the right to be so. In these cases the National Congress and the Idaho Legislature have left regulating to the commission. That necessarily includes giving outright directives to the parties who come under its jurisdiction.

## II

Moreover, it is difficult to accept the commission's view that the parties must first present it with an executed contract, and this is a good example of the problems inherent in a system so regarding. The commission, by its Order No. 15746, in case numbered P–300–12, set out to promulgate a set of rules to be applicable to the development of co-generation and small power production facilities, and engaged itself in a rather extensive, but highly productive, enterprise. It first observed:

> Facilities that qualify under the Act are to be exempt from federal regulation under the Public Utility Holding Company Act of 1935 and from regulation as a "public utility" under state law as well. State regulatory commissions are required to implement the Act by specifying data to be submitted by electric utilities. Commissions are authorized to set rates for utility purchases of power from cogenerators and small power producers and for utility sales of back-up or supplemental power to these same facilities. The commissions are also required to publish standardized rates for facilities under 100KW and to establish procedures for interconnection and wheeling arrangements.

It also asked itself the question:

> If the benefits of cogeneration and small power production are so great—both to the individual utilities and to the nation as a whole—why has their development languished?

And answered it a few lines later:

> When potential cogenerators or small power producers—potential competitors seeking entry into the field of electric generation—have approached the electric utility that alone can serve as a market for purchase of electricity, the response has frequently not been encouraging.

Following which it observed the intervention of Congress.

> Faced with this situation, the U.S. Congress enacted Title II of PURPA in order to foster competition in electric generation. No longer is this phase of production to be the exclusive domain of public utilities. *Their natural monopoly has always been and will continue to be the distribution of electricity. Henceforth, however, electric generation is to be a competitive enterprise* with regulation intervening only to the extent necessary to simulate a free market. (Emphasis added.)

The commission also stated this, relative to the utilities paying the co-generator or small producer rates which are the equivalent of avoided costs:

> This Commission endorses the policy of having each utility pay its full avoided cost when purchasing power from cogenerators and small power producers. Such a price will bring about the equilibrium solution typical of a competitive market where the marginal cost of all firms producing a like product is equal. Anything less will fail to bring about the condition of a free, competitive market and will leave the utility, as sole buyer, in a position to dictate price as it sees fit.
>
> . . . .
>
> The notion of avoided costs is complemented by the notion of a "simultaneous purchase and sale." Simply put, it means that a utility must purchase the entire output of a cogenerator or small power producer at the utility's own avoided costs and, at the same time, must supply the cogenerator or small power producer its entire electric requirement under non-discriminatory rate schedules. In short, the utility must buy at the margin and sell at retail.
>
> It follows that a utility cannot refuse to offer its standard contract rates to

qualifying facilities that do not also happen to be "customers" taking power from the company.

The commission also commented on the treatment which Qualified Facilities (QFs) were to receive from the public utilities:

As to "procedures for obtaining qualifying statutes," the regulations state simply that "a small power production facility or cogeneration facility which meets the criteria [outlined above] *is* a qualifying facility." The facility is simply to furnish FERC with certain information specified in section 292.297 of the rules. No further procedure is required. *Thus, there is no question of awaiting "an award" of status as a qualifying facility, most especially not from this Commission since we have no jurisdiction over this area at all.* Alternatively, a small power producer or cogenerator has the option of filing with FERC an application for certification that the facility is a qualifying facility. If no order issues within 90 days of filing, the application is to be deemed granted. *It thus appears that the criteria for "qualifying facility" status are to be interpreted liberally. This Commission intends that they be so interpreted and we expect our utilities to do so as well.* (Emphasis added.)

Such were the well-considered and well-stated views of the commission in August of 1980. But, this is the year 1987, almost seven years, and over 85 or more cogeneration small power producers cases later.

### I (B)

Empire's efforts should be compared to those of Afton Energy. The state of Afton's preparations in "out-of-pocket expenses" approached $200,000. This included the following: engineering studies; feasibility studies; rough proposals; the permit application process for building a cogeneration plant; the interim cost of developing financial packages, including locating and identifying appropriate lenders and identifying and negotiating with appropri-

ate equity people; company time; and travel. What Empire has done in preparation is purchase a small-sized power facility, carried out a feasibility study of locating a plant of this size at Kamiah, procured engineering studies regarding fuel availability, employed a small power producer consultant to negotiate the contract, and insured the usual attorney fees and travel expenses. Measured on a pure dollar-to-dollar scale, Empire exceeded Afton in expenditures at $225,000 in pursuing its contract. The real distinctions between Empire and Afton would seem to be what? Empire in its initial planning stages had not settled the choice of one exclusive facility site and location; and, as the commission noted, *supra,* was attempting to oblige Water Power's concerns in site selection. A review of the record in *Afton* gives no indication that these requirements nor the more complete financing packages, were crucial to a cogenerator receiving a rate contract.

What *Empire* and *Afton* share is a willingness to contract with an electric utility company to provide power from a small-sized cogeneration facility. While Empire carried out studies with a smaller capacity facility, what Empire desired to contract for with WWP was a 9.9 megawatt facility. Empire's previous indecision should be immaterial. It, like Afton Energy, decided what obligations it would incur, namely the delivery of a specified amount of power. Empire's state of readiness was not what prevented a contract from being formed. The lack of "substantial progress" on the part of Empire should be judged in terms of the contract negotiations as well as with project readiness. The majority notes that during negotiations several objections to certain terms in the contract proposal existed. While true in numbers, these objections are not so true in importance. The record shows that the major points of contention were first WWP's refusal to contract at a rate which it originally proposed; second, what was known as the 4(c) con-

tract clause, a clause which subjected the contract to actions by future commissions;[3] third, the question of whether Empire could be, and should be, required to post security for its performance of the contract.[4]

These matters, and in even more limited terms the first two, caused a breakdown in the negotiations between Empire and WWP. Testimony from Empire's negotiator at the hearing illustrates that party's perspective of the situation.

Q Do you believe that Empire Lumber Company exhausted every reasonable effort to obtain a contract from Water Power?

Q Mr. Tyrer, under this Section 4(c), what do you believe would happen if the Washington Water Power Commission were to disapprove five years into the term of the contract the rates that were in this contract?
A Well, if they disapproved them and raised them substantially, I think we would be very pleased. But if they changed the rates below a rate which we could economically operate the facility for, we would be hung out to dry.
Q By "hung out to dry," you mean—
A We would have nothing but a facility with obligations and no use for it.
Tr., pp. 52, 56.

3. The 4(c) contract clause states:
(c) If any regulatory commission having jurisdiction issues a final order which does not allow for recovery by Water Power of all expenses associated with its purchases under this Agreement in Water Power's rates for sale of power, Water Power and Seller shall jointly take appropriate and reasonable actions before such commission to maintain the rates set forth in Exhibit A. In the event such actions do not result in maintaining the rates *set forth in Exhibit A*, Seller shall have the right to terminate this Agreement, by written notification to Water Power within ninety (90) days of such actions, without further obligation of performance by either party, and without payment of liquidated damages. If Seller does not terminate this Agreement as provided in this section, Seller shall continue to make deliveries under the terms and conditions of this Agreement in accordance with the rates set forth in such final commission order. In the period from the time of effect of such final commission order to the time of the result of any such joint actions, Water Power shall not make payments in excess of such final order.
Tr. p. 119.
Empire's view of § 4(c) was expressed by the contract negotiator:
Q ... What is wrong with continuing commission action, as you refer to it?
A We're seeking a power sales agreement which we can rely on for a long period of *time to justify the investment of large sums of* money to build this facility and a portion of that money will have to be borrowed. And with that condition in there, it's my belief, and backed by attempts to have lenders interested in contracts, with that type of language, you don't have a contract. You have a contract until the first commission, either one of them changes it, and therefore, you don't have a contract of any duration or any strength.
....
A Yes. I have a serious problem with that and that's the problem we've related a lot of discussion to. It's—it just isn't—it isn't a contract because they're talking about future actions. Our relief is a termination of the contract, and what do you do with a $12 million facility that is generating 9 megawatts of power if you're not selling it to the purchaser that you contracted to sell. We certainly can't sell it to Clear Water.

4. The security provision provided for Empire to give security to WWP. The scenario of a buyer demanding security of a seller is a rather unique case. Empire questioned whether it could operate at a profit with this requirement. WWP's view of security was for that of a prepayment.
The security runs in the same form as a loan and to cover the loan amounts.
Q How does that relate to the purchase of the output of a qualifying facility under a levelized avoided cost?
A Under a levelized avoided cost, we prepay for power. We prepay for power that is delivered in the latter part of a 35–year agreement. So that—and we expect to get the return of that effective loan in the latter part of that 35–year agreement. So for that, we request some form of security.
Q Can you—let me put this way: When you are comparing a company like the Washington Water Power Company, or some other publicly-traded company with a company like Empire Lumber Company, can you think of any logical differences in terms of the types of security that they ought to be required to provide in transactions?
A Oh, yes. We don't know the financial aspects of Empire Lumber, financial strength and deficits. The difficulties of the Washington Water power are well known through their published financial statements. So those are significant differences. Our equity is traded on a national market so that people can measure the market value of our equity. In fact, the Potlatch, we used the market value of their equity as a measure of security.
Tr., p. 155.

A  I believe we did.  Lester Bryan said that they absolutely would not sign a contract at the approved rates, and in over a year's time, Washington Water Power gave little ground on the 4(c) fixed rate, long-term contract language.

Q  Mr. Tyrer, I'm going to show you the original, and I believe you have a xerox copy of the original, what is Marked 104; is that correct?

A  That is correct.

Q  Can you tell me what that exhibit is, please.

A  It's a letter from myself to Steven Anderson.

. . . .

Q  Is it still the attitude of, as expressed in the letter, that there is no reason to negotiate when we don't agree on the appropriate rates?

A  I think there were two issues which I have addressed and, one, the adamant refusal to sign a contract at the approved rates and, two, the 4(c) language.

The rest of the issues, Mr. Strong, could be quickly resolved;  . . .

If Washington Water Power takes out the 4(c) language and if they would agree to sign a contract at the rates approved by this Commission, we could have a contract before this afternoon is finished.  Tr., pp. 249, 268–9

The roadblocks to the "substantial progress" of the proposal and the eventual facility lie not in Empire's project development but in the contract terms and negotiations themselves.  As stated numerous times in the record, Empire did not feel a need to expend additional money and preparation time on a project without a rate contract to verify the project's viability. This is especially true in the case of financing a project.  In Afton's case, the tentative financing packages Afton set up required a near immediate contract in order to preserve their fragile financing arrangements—without the contract, no financing and no project.  Empire knew of these difficulties and merely wanted to secure its position before creating additional liabilities.

The progress was not a matter of the proposal's terms being completed but, instead, the negotiations.  Further testimony of Empire's negotiator brings this to issue.

Q  Mr. Tyrer, is it your opinion that prior to the September 16, 1985 meeting that empire had made substantial progress toward completion of the project?

A  They certainly had.

Q  Would you compare the progress Empire Lumber Company made towards its project with the progress Plummer made?

A  Empire had done everything that Plummer had in preparation for a contract.

Q  Mr. Tyrer, do you believe that Washington Water Power and Empire Lumber Company have a common interest in economic development in Northern Idaho?

A  I sure do.

Q  On Page 4 of the March 4th, 1985 opinion, Mr. Tyrer, the Commission requires that the CSPP must make every effort to negotiate a contract.

Is there any other effort you could have taken to obtain a contract which complied with PURPA prior to September 23rd, 1985?

A  I know of no other effort.  I have been involved in a number of negotiations with the utilities from Wisconsin to California, Washington, Wyoming, Montana, Idaho, and these negotiations were stopped by their refusal, stated refusal, to sign a contract at the approved rates. Tr., p. 263.

The finding of the PUC that it was Empire Lumber that was not ready, willing or able to sign a contract does not hold up under an examination of the record.  WWP's withdrawal of its original rate or avoided cost was instead the precipitating factor in a breakdown of negotiations.  WWP suspended its rates to all applicable cogenerator contracts in an effort as it described to

create a current estimate of the avoided cost, and not one which was the estimate for a year and a half ago. This unilateral suspension was questioned by the PUC.

Q ... So the bottom line of my question to you and the reason I wanted to ask it before you were cross-examined is, knowing what you know about the price of power, knowing about the surplus in the region, knowing what you know about regulatory lag—and I have a question that goes on beyond this, but I'll get to it—do you really believe that at the Company's own discretion it can set the process aside and wait until this Commission acts on a new filing? Does that satisfy you, either the act of Congress or the rulemaking by FERC, and finally, the rules of the jurisdiction of Idaho?

A I don't look at it as setting the process aside completely. I look at it as we're faced with what we know is a change of condition, and as a practical matter, I also have to look at will waiting three four months really effect the development of PURPA if we don't know exactly what the rates are during that three or four-month period. I view that that probably wouldn't happen, that the PURPA sites are there and if they're economic under the new rates, they will be developed.

We have never refused to offer a contract. What we did was change the pricing terms, and it was a term from a known fixed tariff to one which we have said, we'll pay whatever the Commission says is our avoided cost currently, but it is whatever our avoided cost is currently rather than what our avoided cost was a year and-a-half ago in which we know at this point doesn't represent our avoided costs any more. So we are, as someone said—

Q You know that as of 1985, on the cusp of '86, that is the case; you don't know that for 1990.

A Oh, no, and of course, the avoided cost is an estimate just like the 1984 run was an estimate. But in our best esti-

mate, we are now estimating this big change.

Someone told me that that puts us between a rock and a hard spot, knowing we have these rates on file that are now not our avoided costs any more. Do we still have the requirement to offer those rates because they aren't our avoided costs?

Q Don't you have the obligation to offer those rates until there is a due process change in those rates given your monopoly as purchaser?

A I think we're trying to define here what our obligation is and that certainly can be one of our obligations. Tr., pp. 162–3.

The PUC went on to hold that WWP improperly withdrew its rate.

Rates are the first 'given' in the negotiating process. They are the one factor beyond negotiation. Water Power cannot withdraw them anymore than it can sell the Brooklyn Bridge. It doesn't have the right. As we indicated in *Coile v. Idaho Power Company*, Case No. U=1006–206, Order No. 17796:

A utility that refuses to honor the rates that are approved and on file at the Commission as even the basis for commencing negotiations with cogenerators or small power producers acts in defiance of final ratemaking Orders. This is true even though the utility has filed for new rates and believes its old rates are inadequate or even confiscatory. To unilaterally change rates that are charged for sales or rates that are paid for purchases is to wage a collateral attack on final Commission Orders in the manner prohibited by Idaho Code § 61–625.

. . . .

For Water Power to continue to assert or infer that it is not bound to the avoided costs published in its tariff schedule, as it did in its brief on rehearing, is indefensible. This Commission will no longer countenance a utility position that asserts that by informing Empire that it

would not contract on the basis of an obsolete albeit filed avoided cost as opposed to its self-determined but unfiled actual avoided costs it was doing little more than discharging its obligations and exercising its rights pursuant to the Public Utility Regulatory Policies Act (PURPA). Tr., pp. 277–8.

The PUC found, however, that Empire had not perfected its entitlement to the rates, that it had during the negotiations

an unyielding insistence on a signed contract before commitment to project size and location.... At some point the discussion must become other than theoretical or philosophical. It must transcend generalities. It must assume a definite form. The proposed facility ·or project must mature before the CSPP is entitled to a contract. Tr., pp. 276, 278.

The PUC held certain terms and elements of the contract must be resolved prior to any agreement being reached, these included the previously mentioned site and engineering specifications as well as insurance provisions, terms of operation, terms of delivery, and security.

The PUC went on to state,

Empire cannot support its contention that Water Power knew the size of the project by alleging facts occurring contemporaneous with or subsequent to Complaint filing, as alleged in its brief on rehearing, *i.e.,* that on 9/23/85 Empire filed its complaint clearly showing a 9.9 MW facility; and that on 10/10/85 Empire duly filed a notice of QF showing a project size of 9.9 MW. The facts support a finding that the output of the proposed facility is still unknown. The sizing of the facility is not based upon the capacity or configuration of any known equipment. The Commission agrees with Water Power that the 9.9 MW figure put forward by Empire was *chosen* merely because of regulatory constraints. Tr., p. 282.

"Chosen" due to regulatory constraints or not, Empire wishes to enter into a contract and obligate itself to deliver power to WWP. The PUC has to some extent lost sight of the intent of the PURPA framework. The pre-eminent feature of a cogeneration agreement is the rate or avoided cost element. *See* IPUC Case No. P–300–12, 8/8/1980. Without the benefit of this element, Empire's continued development of the project becomes near futile. Empire's negotiations do not leave one with the impression there was not a viable cogeneration facility in planning. What does exist is the impression that WWP had as its primary concern, the clauses of a form contract.

## II

The Oregon Court of Appeals just this very year had a similar set of circumstances before it, and as I read that Court's opinion, it could be said that expressed therein are those 1980 statements and declarations embodied in the Idaho Commission's statement of Rules and Procedures, from which the above have been excerpted *supra,* because of their applicability.

Snow Mountain Pine Company filed a complaint with the Oregon PUC to compel an electric power distributor, CP National Corporation to purchase power from Snow Mountain. The PUC ordered CP to purchase power and approved a contract. On review of the PUC's order the Oregon Court of Appeals analyzed the PURPA rules and Oregon regulations. The Oregon Legislature enacted regulations closely paralleling the federal statutes. This included the goal and policy of encouraging qualifying facilities.

Key to enforcing these policies was the utility's requirement of providing as a purchase price the avoided cost. The controversy surrounding the Snow Mountain complaint was over the avoided cost and the issue of when an "enforceable obligation" existed.

If a qualifying facility elects to provide power pursuant to a "legally enforceable obligation," the facility may choose to have the purchase price based on the utility's "avoided costs" calculated at the

time of delivery, or the "avoided costs" projected to apply over the life of the obligation, as calculated "at the time the obligation is incurred." *Snow Mountain Pine Company v. Maudlin, Pacific Utility Commissioner, and CP National Corporation*, 84 Or.App. 590, 734 P.2d 1366, 1369 (1987).

When negotiations fell through over the avoided cost rate, Snow Mountain went to the PUC. The PUC held that CP had an obligation to purchase power when Snow Mountain tendered a contract. CP argued that an obligation is incurred only when a written contract is executed between the parties, that an obligation is not incurred by a qualifying facility's unilateral presentation of a contract, the terms of which have not been agreed upon.

The Oregon Court of Appeals disagreed *holding that "CP's obligation is not governed by common law concepts of contract law;* it is created by statutes, regulations and administrative rules.... 18 CFR 292303(a) ... provides that an electric utility "shall purchase" any energy and capacity "which is made available from a qualifying facility." Thus, the obligation to purchase power is imposed by law on a utility; it is not voluntarily assumed." *Snow Mountain, supra*, 734 P.2d at 1373.

In the controversy over which choice the qualified facility makes in the purchase price calculation with avoided costs, the court commented on the choice based at the time "the obligation is incurred."

The "obligation" referred to for this purpose is the *qualifying facility's* obligation to *provide* energy. That conclusion is supported by the fact that OAR 860–29–010 defines the "time the obligation is incurred" as the date on which a binding obligation first exists to *deliver* energy. Thus, the regulations and administrative rules contemplate that a qualifying facility's self-imposed obligation *to delivery energy* triggers a utility's obligation *to purchase energy*. The date on which the qualifying facility obligates itself to deliver energy fixes the date on which the "avoided costs" are determined.

. . . .

To permit a utility to delay the date to be used to calculate the purchase price simply by refusing to purchase energy would expose qualifying facilities to risks that we believe Congress and the Oregon Legislature intended to prevent. The FERC commentary to 18 CFR § 292.304(d)(2) suggests that a utility cannot "merely by refusing to enter into a contract," deprive a qualifying facility of its right to commit to sell power in the future at prices which are determined at the time the qualifying facility makes its decision to provide power:

'[18 CFR § 292.304(d)(2)] permits a qualifying facility to enter into a contract or other legally enforceable obligation to provide energy or capacity over a specified term. Use of the term "legally enforceable obligation" is intended to prevent a utility from circumventing the requirement that proves capacity credit for an eligible qualifying facility merely by refusing to enter into a contract with the qualifying facility.' 45 Fed.Reg. 12224 (1980). *Snow Mountain, supra*, 734 P.2d at 1371.

The obligation then is concerned with becoming a qualifying facility. As with Empire, the Idaho PUC and WWP are instead concentrating on the lack of a signed obligation, or, in the words of the PUC, an "entitlement" to the avoided costs. Empire's situation is that portrayed in the FERC commentary. WWP is attempting to hold over Empire the lack of a contract due in part to its own refusals in the negotiations. What Empire needs is what Snow Mountain lacked, a set purchase price or avoided cost rate. The Oregon Court of Appeals saw through CP's attempts to thwart PURPA;

We conclude that a qualifying facility has the power to determine the date for which "avoided costs" are to be calculated by tendering an agreement that ob-

ligates it to provide power. Snow Mountain obligated itself to provide power on July 6, 1983, and that is when CP became obligated to purchase power. *Snow Mountain, supra,* 734 P.2d at 1371.

The Idaho PUC, however, although it criticized WWP's efforts, did not see through or past them. When Empire chose to obligate itself to provide power, there should not have been a question of Empire's obligation, but rather, the question should have been, what is the purchase price or avoided cost of the power?—and go from there.

In conclusion, it makes no sense for this Court to uphold the commission's dismissal which arose out of frustration. There is still lying in the woods and around the mills in the area along the Clearwater River an abundance of forest waste products which can and should be put to work producing electricity. The commission has let it be known its displeasure at the attitudes of Water Power and Empire, and no harm done. But, awarding a dismissal to Water Power serves no purpose except to reward it and punish Empire—which cannot be said to be a result worthy of an excellent commission, one of the best in the west.

The Court this day should vacate the dismissal, and remand to the commission with directions to bring the parties back to the bargaining table and thereafter monitor the negotiations with a regard for the intent of the Congress in enacting PURPA, with a regard for its own power to impose sanctions such as costs and attorney fees against either party's recalcitrance and all the time keeping in perspective the excellent tenor of its own 1980 rules, and the guidance of the decision by the Oregon Court in *Snow Mountain.*

To borrow a word newly learned from the commission's order, this may seem to be on the didactic side, but it is well-intended. Doubting that these views will sway the three members of the Court who with Justice Shepard issued the opinion for the Court, the commission is reminded that it also has the power on its own to re-open.

It is a responsibility which it should not turn away too readily.

### ON REHEARING

A petition for rehearing in this matter was granted and the cause reargued. The Court has reviewed the record and considered the arguments presented by counsel, and a majority continues to adhere to the original opinion.

BAKES, HUNTLEY and JOHNSON, JJ., concur.

BISTLINE, Justice, on rehearing, continuing in dissent.

I cannot distinguish any valid reason for the discrete unfavorable treatment Empire Lumber received at the hands of the Public Utilities Commission compared to Afton Energy's success.

The commission came through admirably in Afton Energy's case. There the commission correctly saw its duty, and did it, notwithstanding that it would later hear Idaho Power at oral argument through its attorney make the blatant charge that it had been coerced into contracting with Afton Energy for the purchase of Afton's power by the threat that Jim Bruce (James E. Bruce, then president of Idaho Power) would be put in jail until a contract was entered into. This should be water under the bridge, other than the Jim Bruce myth still echoes throughout this building, and may be an influencing factor when we deliberate the most recent appeal in the ongoing *Afton Energy v. Idaho Power* affray.

Afton Energy almost failed in its bid to become an electricity producer entitled to sell its product to Idaho Power when Idaho Power moved the battlefield to this Court. With one less vote out of a five-member court, Afton Energy would have been put out of business. Whether [because of the federal question involved, i.e., the right of Congress to direct the states to get into the PURPA act] the United States Supreme Court would have granted certiorari is open for anyone's opinion.

As a second observation, although three members of this Court upheld the commission, since the first round of Afton Energy v. Idaho Power, there has been no indication from the two then dissenting members of the Court that the intervening years have changed the views expressed by Justice Bakes in *Afton I*, and on rehearing firmly adopted by Justice Shepard. That view was succinctly set forth in the final paragraph of Justice Bakes' dissent:

> Thus, I dissent from that portion of the majority opinion which uses federal law to grant the Idaho Public Utilities Commission jurisdiction to order Idaho Power Company to enter into the fixed term contract which it approves today. *Afton Energy, Inc. v. Idaho Power Co.*, 107 Idaho 781, 793, 693 P.2d 427, 437 (1984).

It is fair to say that had the views of Justices Shepard and Bakes prevailed in *Afton I*, not only would Afton Energy been kept out of electricity production, but so would almost one hundred other co-generators! Out of fifty states, Idaho would have been out of step. Think also of the loss of the electricity produced by the co-generators in this summer of 1988. Idaho Power has already given notice that it will be obliged to fire up its coal powered generators in order to off-set the loss of hydro powered electricity at a cost to be passed on to the ratepayers. PURPA was thought to be a good national program. The Idaho Public Utilities Commission was in agreement, and over fierce opposition fought to a successful conclusion.

All of which has something to do with the plight of Empire Lumber. Turned away by the PUC, it had no alternative but to come to this Court. Its chances of success could not be considered too great since it would argue its case to two members of the Court who have yet to disavow their *Afton I* views quoted above. And any chance of success would become slimmer when by luck of the draw to one of the two *Afton I* dissenters would fall the honor of drafting the opinion for the Court. To which, fractionally, might be added that the composition of this Court included only one justice from north of the Boise city limits. But, to his credit, when *Empire Lumber's* petition to this Court for rehearing was filed, that sole justice from south of the Boise city limits cast the necessary vote, and the case was briefed again, and reargued. Nor was it a perfunctory exercise on the part of the parties, Washington Water Power, Empire Lumber, and the Public Utilities Commission. We have been presented by them with three sets of helpful briefs.

What has come of it is nothing but further disappointment for Empire Lumber—which is guilty of no fault other than, if it be a fault, being better out-niggled by Washington Power than was Afton Energy by Idaho Power. The Chief Justice's opinion on rehearing in this weighty matter is not much to my satisfaction. Nor do I expect that it will bring much credit on those who so readily join it.

The very least that might have been done by the adhering majority would be to back off from the language (at 194, 755 P.2d at 1232) which inferred that Empire had no interest in furnishing Washington Water Power with electricity, but only desired to obtain an option. In the 1987 opinions I wrote in effect (at 195, 755 P.2d at 1233) that there were some members of this Court who were utilizing the commission's option language, taken out of context, to ascribe to Empire Lumber the motives of naught but a speculator. At the oral argument on the rehearing counsel adverse to Empire assured us, responding to my inquiry, that the connotation which was to be taken from the commission's use of option was only as to size of the power plant. Nevertheless those who comprise the majority are apparently too busy to correct the 1987 opinion in that respect—even though it is unfair to leave stand an opinion which admittedly is erroneous in so inferring improper motivation to Empire.

Nor do those members of the Court who join the 1988 say-nothing opinion deign to mention the appearance of a new party in

the action. What was formerly just Empire's case against Washington Water Power at the rehearing had now the benefit of the City of Kamiah's brief supporting Empire's effort to obtain a commitment from Washington Water Power.

Although there should not have been, there seemed some doubt in the minds of the commissioners, and then again in the minds of some members of this Court as to where Empire would put its small power producing plant. That problem did not actually exist, and doubt should no longer linger about in the face of the brief filed by the city of Kamiah. That brief is neutral in tenor, and well reflects the law, grounds, and reasoning which should influence this Court in turning over the punitive action of dismissal inflicted upon Empire at Washington Water Power's request. That brief goes wholly ignored by those members of the Court who constitute the majority. It might as well have not been written. It is, however, worthy of consideration and comment. Doubting my ability to improve upon its content by a paraphrasing reduction, I adopt and incorporate it as part of this opinion. It also, to my mind, well presents the denigration of the federal interest which has been effectuated by the commission and this Court. The reader will readily see that none of its weighty authority-fortified comments have been understood or undertaken in either the 1987 or 1988 opinions for the Court:

### STATEMENT OF THE CASE

The City of Kamiah, (City) appearing as Amicus Curiae, generally concurs with Empire's Statement of the Case. The City would note that both Water Power's and the Commission's Statements of the Case completely ignore Empire's filing of a notice of a qualified facility at the Federal Energy Regulatory Commission (FERC) on October 10, 1985. Water Power and the Commission eventually argue that Empire's filing, indeed, even the fact Empire was a qualified facility, was insufficient to entitle it to a contract from Water Power

at Water Power's filed rates. This position is untenable in view of federal and state law requiring regulated utilities to purchase from *all* qualified facilities energy and capacity at lawful and existing, avoided costs. Other states such as California and Oregon require utilities to purchase capacity and energy from qualified facilities. Lumber mills in such states will be at a distinct competitive advantage threatening Idaho's lumber industry if Idaho mills cannot develop reliable markets for electricity generated from wood wastes by qualified facilities.

The City's brief will address only the limited question of a regulated electric utility's legal obligation to offer to purchase capacity and energy from a qualified facility. Resolution of this issue will determine the future of PURPA and its benefits in Northern Idaho including the economic viability of the City of Kamiah.

### ISSUE STATEMENT

The issues presented in this case are:

1. Whether Water Power and the Idaho Public Utilities Commission can eliminate the benefits of PURPA in Idaho by ignoring the legal obligation of a regulated utility to offer to purchase power from a qualified facility.

2. Whether Empire's filing to FERC of October 10, 1985 effectively established the size and location of Empire's qualified facility and entitled Empire to a contract at Water Power's filed avoided costs.

3. Whether federal law preempts the state from regulating qualified facilities and determining when a regulated facility must offer to purchase power from a qualified facility.

### POINTS AND AUTHORITIES

A. Congress enacted PURPA to address its finding that traditional utilities were experiencing increasing costs and decreasing efficiency by relying on fossil fuel energy sources. *Federal Energy Regula-*

*tory Commission (FERC) v. Mississippi,* 456 U.S. 742, 745, 102 S.Ct. 2126, 2130, 72 L.Ed.2d 532 (1982), *Afton Energy, Inc. v. Idaho Power Company,* 107 Idaho 781, 783, 693 P.2d 427, 430 (1984).

B. Congress found two problems impeding the development of independent power production: 1) utilities normally would not purchase electric power from independent power producers; and 2) state and federal regulation imposed financial burdens that discouraged development. *FERC v. Mississippi,* 456 U.S. 742, 750–51, 102 S.Ct. 2126, 2132–33, 72 L.Ed.2d 532 (1982). *Afton Energy, Inc. v. Idaho Power Company,* 107 Idaho 781, 784, 693 P.2d 427, 430 (1984).

C. Congress directed FERC to prescribe rules that require electric utilities to offer to purchase electric energy from qualifying facilities and exempt qualifying facilities from state and federal laws governing electric utilities. 16 U.S.C. § 824a–3(a) and (e).

D. Most importantly, it [the small power producer's notice of self certification] required electric utilities—in this case FPL —to purchase energy from the qualifying small power production facility at favorable rates. 16 U.S.C. § 824a–3(a)(2), 3(b). *Florida Power & Light Co. v. Federal Energy Regulatory Commission,* 711 F.2d 219, 221 (D.C.Cir.1983).

E. Congress intended that the federal agency determine which facilities attained qualified facility status under PURPA. 1978 U.S.Code Cong. & Admin.News 7823.

F. State Commissions are preempted from requiring electric utilities to offer to purchase power from facilities that qualify only under state law. *Consolidated Edison Company v. Public Service Commission,* 63 N.Y.2d 424, 483 N.Y.S.2d 153, 472 N.E.2d 981 (1984) appeal dismissed 470 U.S. 1075, 105 S.Ct. 1831, 85 L.Ed.2d 132 (1985).

## ARGUMENT

### A. PURPA HAS A DOUBLE BENEFIT FOR IDAHO

The energy shortage of 1978 pointed out keenly the American dependence on fossil fuels and foreign oil. Congress found that generating electricity was the largest use of these fuels, consuming more than a quarter of all energy resources. 1978 U.S. Code Cong. & Admin.News 7659. Congress additionally found that the electric utilities were experiencing increasing costs and decreasing efficiencies due to this reliance on oil and gas. 1978 U.S.Code Cong. & Admin.News 7659, *Federal Energy Regulatory Commission (FERC) v. Mississippi,* 456 U.S. 742, 745, 102 S.Ct. 2126, 2130, 72 L.Ed.2d 532 (1982), *Afton Energy, Inc. v. Idaho Power Company,* 107 Idaho 781, 783, 693 P.2d 427, 430 (1984). Because this situation adversely affected consumers and the national economy, Congress considered numerous alternatives to the traditional electrical production facilities and chose to promote cogeneration and small power production (CSPP). *FERC v. Mississippi,* 456 U.S. at 750, 102 S.Ct. at 2132.

Cogenerators and small power producers consist mainly of hydroelectric facilities and facilities using biomass or waste as an energy source. In nearly every instance, the CSPP effects a double economy, either by using the heat produced twice, once to heat a facility and twice to generate electricity; or by using an otherwise useless or costly waste to produce electricity and make the facility more efficient and its other products cheaper. The latter is especially the case in Northern Idaho and Kamiah.

Kamiah is a City of approximately 2,000 people. The livelihood of nearly the entire population and the economy of the City and region depends directly on the timber and timber products industry. In recent years, the timber industry and Kamiah's economy, have suffered due to competition from Canadian lumber mills and high fuel costs. A number of Northern Idaho lumber mills, such as Empire, when it sought to build a qualified facility, added facilities that burn waste wood chips to produce electricity. This added income stream offsets the high costs of fuel and makes American timber products more competitive, clearly a benefit to the surrounding communities.

## B. THE RECORD DOES NOT SUPPORT THE COMMISSION'S DECISION OR WATER POWER'S ARGUMENT THAT IT DID NOT KNOW THE SIZE OR LOCATION OF EMPIRE'S FACILITY

Both the Commission and Water Power argue that Empire was not entitled to contract with Water Power because the size and location of Empire's facility was unknown. This argument does not survive a close reading of the record as Empire has shown in its petition and briefs.

The record clearly discloses that Empire had planned and developed for its mill at Kamiah, the same type of facility that other mills had installed. *Empire did not seek simply an option to produce electricity but was instead engaged in a long term process to protect Empire's economic viability.* The record further shows that Empire continued to negotiate with Water Power until Water Power *unlawfully* withdrew its legally mandated rates as the price it would pay. Only after Water Power's unlawful action (see Commission's Brief, p. 39) did Empire file its complaint and abandon negotiations. Negotiations ended solely because Water Power refused to offer the existing avoided costs even though it's undisputed that the avoided costs were legally available until January 14, 1986.

As the employer of over 200 people in the area of Kamiah, Empire had clear designs to produce electricity at its Kamiah mill. At least as of October 10, 1985, Water Power and the Commission were aware of the size and location of Empire's qualified facility. The record simply does not support any argument by Water Power and the Commission to the contrary, given the record showing a qualified facility FERC filing and filing of a complaint at the Commission. The record is further undisputed that Water Power continued to ignore Empire's demands for a contract even to the point of ignoring Empire's contract, tendered to Water Power on or about December 19, 1985.

## C. PURPA'S SUCCESS DEPENDS ON THE UTILITIES FULFILLING THEIR LEGAL OBLIGATION TO OFFER TO PURCHASE POWER FROM QUALIFIED FACILITIES

Although Congress decided on CSPP power as the most desirable alternative to traditional electric utilities' electric production, Congress encountered two impediments to the development of CSPP power: "(1) traditional electricity utilities were reluctant to purchase power from and to sell power to, the nontraditional facilities, and (2) the regulation of these alternative energy sources by state and federal governments imposed financial burdens upon nontraditional facilities and thus discouraged their development." *FERC v. Mississippi*, 456 U.S. at 750–51, 102 S.Ct. at 2132–33, citing to the Congressional Record. PURPA attacks these two concerns directly. Section 210 of PURPA directs the FERC to promulgate regulations that: a) require electric utilities to offer to purchase power from qualifying facilities (16 U.S.C. § 824a–3(a); and b) exempt qualifying facilities from state and federal laws governing electric utilities. 16 U.S.C. § 824a–3(e).

These provisions are the key operative provisions of PURPA which permit the development of the independent generation industry which previously was stifled by regulation and utilities. Without the legal obligation to offer to purchase power from qualified facilities and the exemption from state and federal regulations, PURPA fails. Congress and the Federal Energy Regulatory Commission knew that regulated utilities would not voluntarily purchase a qualified facility's energy and capacity and, accordingly, provided for PURPA to explicitly require the regulated facilities to purchase (16 U.S.C. § 824a–3(a)) and for the regulations under PURPA to require the utilities to purchase (18 C.F.R. § 292.207(c)) from a qualified facility.

## D. PURPA AND FEDERAL REGULATIONS REQUIRE WATER POWER TO PURCHASE ELECTRICITY FROM EMPIRE AT AVOIDED COSTS

As noted above, PURPA requires electric utilities to purchase electricity from qualified facilities. 16 U.S.C. § 824a–3(a). Utilities must purchase their electrical energy at their incremental or avoided costs. 16 U.S.C. § 824a–3(b) and 18 C.F.R. § 292.203.

The qualifying facility, *at its option*, may require the utility to purchase the energy as it becomes available or purchase the energy pursuant to a "legally enforceable obligation," over a specified term. 18 C.F.R. § 292.304(d). If the facility chooses the latter, the "legally enforceable obligation" the rates for such purchases are based on either the avoided costs calculated at the time of delivery or avoided costs calculated at the time the obligation is incurred. 18 C.F.R. § 292.304(d)(2).

FERC's regulations also define which facilities qualify for this beneficial treatment. Under FERC regulations, independent generating facilities qualify if they meet the maximum size, fuel use and ownership criteria of FERC's regulations. 18 C.F.R. § 292.203.

Under these regulations, the facility may, at its option, self-certify or file for certification with FERC. 18 C.F.R. § 292.207. The preamble to these regulations is quite clear that a facility qualifies, if it does, when it meets the criteria set out in Section 203. Filing a Notice of Qualification with FERC signals the previous qualification of the facility. 45 FR 17962 (March 20, 1980). Once the facility qualifies, the utility has no choice, but to offer to purchase all of the power of the facility. 18 C.F.R. § 292.303.

The decision of the Federal Circuit Court of Appeals for the District of Columbia in *Florida Power and Light Co. v. Federal Energy Regulatory Commission*, 711 F.2d 219 (D.C.Cir.1983), is precisely on point. Interpreting FERC's regulations at Section 207 on certifying, the Court states that qualified facilities have the option to self-certify, but once certified, they can demand a contract from the regulated utility. "Most importantly, it (the small power producers' notice of self-certification) required electric utilities—in this case, FPL—to purchase energy from the qualifying small power production facility at favorable rates. 16 U.S.C. §§ 824a–3(a)(2), 3(6)." *Florida Power and Light* at 221.

Assuming, arguendo, that Water Power had reason to believe that Empire was not a qualified facility before September 16, 1985, it has no argument that Empire was not a qualified facility after October 10, 1985, the date Empire filed with FERC, notification that Empire had self-certified. Without question, from at least that point, Water Power was legally obligated to offer to purchase electric power from Empire at the avoided cost rates then in effect. There is no basis in federal statute, federal regulations, or federal case law to argue to the contrary.

## E. CONGRESS INTENDED PURPA TO DISPLACE STATE REGULATION OF QUALIFIED FACILITIES

Water Power's and the Commission's contention that State Commissions are free to regulate qualified facilities must fail in light of federal and state law. As noted above, one of the major impediments to the development of CSPP power was the pervasive state and federal regulation that economically discouraged cogenerators and small power producers. Water Power and the Commission would now have the Court believe that this is not what Congress intended when it adopted PURPA and directed FERC to promulgate regulations that exempt qualifying facilities from state and federal laws governing electric utilities. 16 U.S.C. § 824a–3(e). The Commission would have the Court believe that although a facility may qualify under PURPA, this only "qualifies a project for benefits," which benefits somehow do not include having a regulated utility offer to purchase

electricity. The state, the Commission argues, finally determines which facilities are qualified facilities, not Congress or FERC. This assertion must also fail.

Congress addressed this situation expressly, adopting the requirement that FERC exempt qualifying facilities from state and federal regulations. In discussing this provision, Congress explains that determination of qualified status is the express province of the federal agency:

> The purpose of this determination is to provide a means to insure that such a facility is *identified through Commission (FERC) action* for purposes of showing that it is in fact included in any exemption under § 210(e) of the Federal Power Act.... The conferees intend, in providing for requirements respecting qualifying facilities to be *established by the Commission by rule,* that the Commission provide requirements under which a person may ascertain in advance of construction or operation of any facility whether or not such facility will meet the criteria contained in those definitions. 1978 U.S.Code Cong. & Admin.News 7823. (Emphasis Added)

It is clear that Congress intended to preempt the state from exercising regulatory jurisdiction over qualifying facilities. In *Consolidated Edison Company v. Public Service Commission of New York,* 63 N.Y.2d 424, 483 N.Y.S.2d 153, 472 N.E.2d 981 (1984) *appeal dismissed,* 470 U.S. 1075 (1985), the New York Court of Appeals recognized that Congress preempted the states from regulating qualified facilities. "The second issue is whether Part II of the Federal Power Act (FPA) (see 16 U.S.C. § 824, et seq.) preempts the PSC from compelling utilities to offer to purchase power from facilities that qualify only under the Public Service Law. This Court holds that it does." *Consolidated Edison,* 483 N.Y.S.2d at 159, 472 N.E.2d. at 987. State commissions are simply not free to consider state imposed standards in determining which facilities are entitled to the benefits of PURPA.

This Court, in considering whether a qualified facility is entitled to a long-term, fixed-rate contract, quoted the legislative history:

> The Conferees wish to make clear that cogeneration is to be encouraged under this Section ... The establishment of utility type regulation over them would act as a significant disincentive to firms interested in cogeneration and small power production. 1978 U.S.Code Cong. Section Admin.News 7831–32.

*Afton Energy,* 107 Idaho at 787, 693 P.2d 427. This Court then states that the FERC regulations implementing PURPA similarly do not contemplate utility-type regulation over rates paid to CSPPs. Finally, this Court recognizes that "[i]n fact, one of Congress' main objectives in enacting PURPA was to encourage cogeneration and small power production by exempting CSPPs from pervasive state rate regulation." *Afton Energy* at 788, 693 P.2d 427. Water Power and the Commission would now ignore this Congressional intent and impose state regulation upon, and, therefore, discourage development of cogeneration and small power production.

## F. NEITHER WATER POWER NOR THE COMMISSION DENIES EMPIRE'S STATUS AS A QUALIFIED FACILITY

A thorough review of the record discloses that neither Water Power nor the Commission has ever challenged Empire's status as a qualified facility. In fact, in their briefs, Water Power and the Commission both admit that Empire is, and at all relevant times was, a qualified facility. Yet, Water Power refused to fulfill its legal obligations to offer to purchase power from Empire at its avoided cost and the Commission condoned this action. There is no argument at law or in equity that would allow Water Power to shirk its obligations under PURPA to offer to purchase power from a qualified facility at the avoided cost rates on file with the Commission. The City of Kamiah has a vital need for Empire Lumber's continued viability and urges this

Court to require Water Power to purchase Empire's capacity and energy at rates in effect as of the date of Water Power's refusal to purchase in September of 1985.

## CONCLUSION

There is no question that Water Power shirked its legal obligation in September of 1985 to offer to purchase power from Empire's qualified facility at Water Power's avoided cost rates established by the Commission. Rather than compelling Water Power to fulfill its legal responsibility, the Commission has condoned and encouraged Water Power's actions based on erroneous conclusions as to its authority to regulate "Qualified Facilities" created by federal law. If Idaho's cities such as Kamiah are to survive in today's competitive lumber industry, regulated utilities such as Water Power must be compelled to offer to purchase power just as other utilities in neighboring states are required to purchase from mills in competition with Empire Lumber.

Moreover, there were some candid admissions made at the oral argument on rehearing which have completely escaped the majority. Most of these admissions, or at least statements in the nature of admissions, for the most part were in answer to questions from the bench, on Empire's oral presentation, opening argument:

I take it that your argument is that once you filed that, even assuming you didn't know what the site was and the size was, nonetheless you still had the fixed right as of the time you filed it. Now, it seems to me that's a clear question of law, federal law, that we can decide if that's the right issue. I want to make sure we have the right issue that we're focusing on.

MR. ORNDORFF: Mr. Justice Bakes, I think that you've picked up on the central issue that on rehearing that is in the brief, that the filing of the QF is a federal question and in looking at QF, does the QF naming the site and naming the size of the facility under the Federal Regulations and under PURPA entitle Empire to an offer to purchase from Washington Water Power at the then existing avoided cost.

THE COURT: Let me add one phrase to that. Even if, as a matter of fact, you haven't picked the site and haven't picked the size. Because, let's assume that, because the Commission found that. Now, let me add that to your question and say is that the legal issue in this case.

MR. ORNDORFF: That certainly is a legal question. I don't believe the record supports the Commission's findings that—

THE COURT: I agree that you disagree on that. That's a separate question we've got to decide. But assuming that the record did, *is that the legal question we've got to decide, whether that filing, that QF filing in October, setting out the site and the size is adequate to grandfather your rights in,* even though, as the Commission found, wrongfully I know you argue, that you hadn't had a site picked and you didn't have a size picked?

MR. ORNDORFF: I believe that is true Mr. Justice Bakes.

THE COURT: Mr. Orndorff, as I understand the Commission found that the only engineering study your folks had done was study whether fuel might be available for either a 3.75 megawatt or a 5 megawatt plant. Are they correct in that finding?

MR. ORNDORFF: There were some studies done prior to September 16th when Water power refused to offer any rate or any contract at the rate. As far as those studies being a basis for denying a qualified facility, a contract right, I submit that PURPA does not make that one of the criteria for being a qualified facility entitled to a contract. I have—I disagree with the Commission using that in anyway to reach a conclusion as to which qualified facilities are entitled to a contract.

THE COURT: *Well, suppose after your certification of October 10th, Water Power came back on October 11th and said, "yes, we'll buy 9.9 megawatts at Kamiah."* How long do you think you have then to design and get a plant on line and still grandfather those rates?

MR. ORNDORFF: The contract form that Empire presented Water Power in December of 1985 had a very—had what's known in the trade as a drop dead date; that the facility had to be up and running by a fixed date. Now, I think that date was '88 or '89. This goes back a few years, but that's typical in this area that there is a fixed date by which the facility has to come up and be running. It's not unusual at all to have provisions milestones as to construction in the process of building the plant so that the utility can accurately determine whether or not the resource is coming on.

THE COURT: Mr. Orndorff, I'd like to go back to Mr. Justice Huntley's question, which I don't really think you've addressed directly. I thought his question was that the basis, or a basis of the Commission's findings was that the only feasibility studies in the evidence were those relating to the 3.175 megawatt or a 5 megawatt plant. Was, in fact, that the evidence and the only evidence before the Commission?

MR. ORNDORFF: Mr. Chief Justice, it was not the only evidence. There was testimony from Mr. Clough, who was President of Empire that those studies were indeed made but that in his opinion, and the opinion of the people he had talked to, including a letter from Potlatch, that there was more than ample fuel in northern Idaho, in fact there is an overabundance of fuel was his testimony in northern Idaho to fuel this plant. The studies were made, that is true, but they are not the only evidence as to the availability of fuel.

THE COURT: Let me get it down as narrow as I guess I can get it. There were no studies, in quotes, relating to a 9.9 megawatt plant? No feasibility studies?

MR. ORNDORFF: There were no fuel studies as to a 9.9 megawatt plant. The engineer for Empire, Mr. Donald Laten, who was the same engineer that assisted as a consulting engineer, not the Tammerack but the Wood Power project, certainly looked at the size of the facility and was comfortable with it. He testified at the hearing. Mr. Tryer, who was also a consultant was familiar with the size of the facility and very familiar with the wood waste projects and had done extensive work with five or six other projects in the northwest and he was comfortable with the sight and the size of the project. While there were isolated studies doesn't, they are not the only evidence in the record.

THE COURT: Well, let me take one more in that line then. We're dealing with a boiler that generates steam that fires a turbin, is that what we're doing? A turbin generator?

MR. ORNDORFF: Yes, Mr. Justice.

THE COURT: Okay. Now, what about the finding that the sizing of the facility, this is from the Commission Order, the sizing of the facility, referring to the 9.9, is not based upon the capacity or configuration of any known equipment. Now, are they entitle—is the Commission entitled to say that since as of October 10th you aren't able to show us a design of any known equipment that produces 9.9 megawatts, that therefore your application is not serious, it's merely speculative and therefore we don't grandfather you.

MR. ORNDORFF: Mr. Justice Huntley, I have a real difficulty with the Commission getting into the engineering business and trying to determine whether a qualified facility is qualified because it can produce a specific design of its generating facility, when it doesn't yet have a contract.

I think if you look beyond the Commission's Order and look at what's happened

in the industry, 9.9 megawatt wood waste plants are a common fact of life in our sister states, California, Oregon, throughout the northwest, and to say that—to suggest that this is some kind of novel piece of equipment that is of questionable ability to perform, certainly doesn't focus on the existing projects in Idaho, California and Oregon where these projects are common in many schools of thought. They're a necessary addition to a sawmill in order to survive in the present economy. So to focus on that engineering as a pre-condition ignores certainly the federal mandate in PURPA 207(c) and ignores just what really is out there in the universe of what's practical to build a plant. That equipment is known, it exists and the fact that you haven't spent—

THE COURT: Okay. I understand that argument and I had one more question, I've forgot it now. I'll remember it when you get back up here. Oh, I know what it was. We keep brandishing this word "qualified" around. What does it really mean to be qualified, other than is less than a certain megawatt of capacity?

MR. ORNDORFF: The Public Utility Regulatory Policies Act was designed by Congress to create independent generating sources of power from waste—

THE COURT: See if you can be more specific. What makes something qualified?

MR. ORNDORFF: Okay. In the course of creating this system, Congress tried to limit which waste projects were going to be entitled to the benefits of PURPA, one of those benefits being the right that a utility had to offer to purchase. To do that, Congress set out the mandate to FERC to adopt regulations defining qualified facilities. Those regulations were adopted in 1980 and they are set forth in 18 CFR 292, 201 through 207.

There are two forms, actually there are three forms of qualified facilities generally. There is a bio-mass waste,

there's hydro and then there's, of course, wind and geothermal. Those are the broad classifications. Within each of those, there are criteria that you have to fulfill for a wood waste plant, small power production, the regulations provide and the law provides that it cannot be in excess of 80 megawatts, that you have to identify location, size. It's pretty much set forth in 207(a).

THE COURT: Okay. Thank you.

MR. ORNDORFF: Thank you Mr. Chief Justice.

For instance, on Washington Water Power's presentation:

THE COURT: *So it has nothing to do then with Water Power worrying that there would never be a plant on line.* that doesn't figure into it at all? *It's just a question you didn't want to be subjected to the grandfather rates?*

MR. STRONG: *That's correct, Your Honor.*

THE COURT: No challenge as to Empire's ability to go out and find a 9.9 or 10 megawatt generator?

MR. STRONG: Well, Water Power simply was without knowledge of this proceeding as to whether there would be 9.9 megawatts, and therefore was understandably reluctant to enter into a transaction guaranteeing grandfathered rates when it appeared that they wanted an option for some size of facility up to 9.9 megawatts at the then old obsolete rates.

On the commission's presentation:

MR. WOODBURY: I appreciate this opportunity to represent the Idaho Public Utilities Commission and to present their reasoning and justification for the dismissal of the complaint brought by Empire Lumber Company against Washington Water Power.

THE COURT: While you're right there, would you go ahead and answer the question that I propounded to Mr. Strong. What policy for the state of Idaho did you advance you—you the Commission, advance by dismissing this

instead of retaining jurisdiction, appointing a mediator or somebody to sit in on these hearings and hammer out an agreement between these to outfits, one of which wants to produce electricity in Idaho, and as we learned today by the filing of the amicus brief also helped out with the economy of a substantial little city in north Idaho.

MR. WOODBURY: Mr. Justice Bistline, I believe that the Commission would sympathize with the community of Kamiah and would like to see the development of a project in northern Idaho. However, *the Commission has taken the position that it is not its function to negotiate or arbitrate contract terms.* We can impose our will if we can, on the parties, on Water Power, tell them we want to negotiate in good faith. But we're not going to negotiate that contract for the parties. We feel that there is freedom of contract and that the way PURPA and FERC rules have been set up, for us to negotiate for the parties themselves—

THE COURT: Didn't—excuse me. Didn't some document go out of the Commission about the year 1980 which mentioned the fact, whether it was true or not, that complaints were being made that Washington Water Power was not working in good faith with people that wanted to become small co-generators.

MR. WOODBURY: I'm not familiar with that document. I think that the Commission has expressed an attitude that it's—perhaps the utilities may be pre-disposed to stonewall qualifying facilities and co-generators.

\*    \*    \*    \*    \*    \*

The Commission has the grant of power from 18 CFR 292, 401. That authorizes or empowers the Commission to issue regulations, *to resolve disputes on a case by case basis and to engage in any other action reasonably designed to implement the regulation of sales and purchases between qualifying facilities and our purchasing electric utilities.*

Also of no small consequence is 292, 602(c)(2) which indicates that a qualifying facility is not exempted from state law and regulation in this particular field.

What are the guidelines and rules of implementation established by the Commission? The Commission requires that contracts be filed with it for review, approval and lock-in of effective rates. *Alternatively, it requires that a complaint be filed with it wherein the qualifying facility establish facts which would show that it is otherwise entitled to a contract.*

The Commission in its analysis focuses on the maturity of a project, the status of the negotiations and applies a "but-for" test. In looking at the maturity of the project it makes the determination of whether or not substantial progress has occurred. Justice Bakes mentioned the Afton decision and the Commission's language in there that, which is also similar to the Commission's language that a development or project takes place in a continuum along which certain milestones must be passed. The Commission indicates that active negotiation is a requisite to qualifying for a contract. They don't want to have the complaint process used as an alternative to negotiation. They feel that the parties must be ready, willing and able to sign a contract. Empire, when it came into the door, must have been in a position that it was ready and willing to bind itself to a complete contract.

\*    \*    \*    \*    \*    \*

*The Commission feels that as the implementing arm of the Federal Energy*

*Regulatory Commission in administering PURPA on a state level, it has the power to assess the continuing qualification, qualifying status of a facility.* In this particular case, the Commission found that short of filing with FERC, Empire had done nothing to develop, acquire a—to develop or acquire or proceed with a 9.9 megawatt facility.

The findings of the Commission in this case were that Empire failed to perfect its entitlement to a contract and a lock-in of those rates. That at no time was it ready, willing and able to sign a contract, that it had failed to satisfy the Commission's standards *and that it had failed, most of all, to make a binding offer.*

THE COURT: Granted you agree with the Commission that this thing wasn't far enough along to entitle them to, what I'm going to pick out the word, bona fide status, serious applicant. What do you think the standard is that must be imposed on the Commission as to when they can make that judgment? *How far along must something be?*

MR. STRONG: When the qualifying facility developer is willing to enter into a legally enforceable obligation upon which the utility can rely to defer its other power acquisitions and when the QF is ready, willing and able to enter into that sort of enforceable obligation. Now, that standard would obviously apply in different circumstances. In the Florida Power and Light case which Empire cited, that case involved a project which was already in existence, or at least largely constructed. It would be reasonable for a utility to be able to look at a self-certification and an existing project or one that was largely constructed and make the decision, yes, we can reasonably rely upon that commitment of that developer and defer acquiring power from other sources.

THE COURT: *Well, are you suggesting then that you, before you can get a contract, you have to have your facility substantially built? I thought in the real world here that in order to build, you needed a contract in order to get your financing.*

MR. STRONG: Well, my understanding, and maybe Mr. Woodbury can respond to this better. My understanding is that this standard has been applied to all of the contracts which have been approved in the State of Idaho. *But I'm not suggesting that you necessarily have to have a project physically built.* You may have, as we all know, there are various stages of a project, starting from blueprint up to actual physical construction of the facility. *And it may be that somewhere along that progress, there is the legally enforceable obligation commitment upon the QF.* I would suggest that it clearly is not way back at the beginning where Empire was, where there was no facility development whatsoever, where the record indicates that 9,900 kilowatts was chosen partly based upon the constraints of the tariff; which is a 10 megawatt tariff, partly upon regulatory constraints in the State of Washington, and that partly it represented a ceiling and I believe there was testimony to the effect that it wasn't until there was an assurance of the guaranteed rate that Empire was going to make the determination as to what the size of the facility was going to be. Clearly, if they had come in and offered 3,750 kilowatt facility, that would have been somewhere along this continuum. I'm not suggesting that would fall to one side of the line or the other. But it's clearly, even that sort of commitment

would have been something different that than the 9,900 kilowatts which they're claiming a right to sell.

THE COURT: Before we leave that question, let me come up with a thought or something I'd like to hear from you on. The Commission, I believe, said something about Empire had spent in the area between $200,000 and a quarter of a million dollars in trying to get into this project. Do you disagree with that figure?

MR. STRONG: I believe that's the correct range of figures.

THE COURT: Which is substantial, I mean a lot of people in Idaho would think that that's substantial. Your position is that the utility, working under the constraints of PURPA which is probably not what you want to do but you were doing it, you'd like nevertheless to be able to plan ahead, in long range planning. You talk like that. All right. I think I follow. And isn't it just as likely that the small co-generator wanting to get into the business of producing electricity in conjunction with an existing lumber mill also wants to plan ahead and here in the planning ahead, they've spent $250,000, they have acquired a small generator, I think its' reasonably clear from the discourse you had with Justice Huntley that larger plants are not, you concede they're not hard to find around the county, like even I can go out and buy a small generator for my cabin, and I assume that these big ones are available—and they want to plan ahead. *But planning ahead usually involves, as Justice Huntley pointed out, financing and they would like to know that they will have a contract. And you'd like to know that they're reliable, and that seems to be where the issue is. Isn't that it? You think that they aren't*

*reliable, so you wouldn't give them a contract.*

MR. STRONG: Well, that's one way of summarizing the issue Mr. Justice Bistline, but I'd like to point out—

THE COURT: I thought that was your summary of it.

MR. STRONG: It's reliability would be one of the factors which would be taken into account by the Commission in determining whether there was a willingness to enter into a legally enforceable obligation. That's correct.

Counsel for Empire had listened carefully, and in closing the oral argument presented an excellent review of what had been said:

MR. ORNDORFF: Thank you Mr. Chief Justice. One of the, I think one of the important—probably the most important part of this case is to review just quickly what we've heard this afternoon, or at least I think I've heard. Empire sought to negotiate with Water Power from '84 until September of '85. Had some difficulty with 4(c) language in a fixed rate contract as the opening brief in this matter has a letter attached from Perry Swisher then President of the Commission, telling Water Power it cannot insist on 4(c) language. Order came out from the Commission specifically instructing Water Power not to insist on 4(c) language. The parties met on September 16th immediately following that order, Water Power refused to sign any contract at the existing rate. Those existing rates remained in effect until January 14th. During that time Empire took every act it could to solidify its position as a qualified facility entitled to the rates. It sought to negotiate with Water Power in tendering a contract. It filed a QF stating the size of the facility, the

location of the facility. It filed a complaint, which as Counsel for the Commission stated, that it is a pre-requisite to grandfathering your right. The facts are that in order to really get a contract and to be, if you will, a dependable producer, it needed a Commission order requiring Water Power to sign.

Between filing the complaint and January 14th, the Commission did not have a hearing until December 20th, and in fact, didn't issue its opinion until March 4th of 1986, well after the rates had disappeared. The Commission in its second order, I might just read from 277 of the record, states accordingly, "Rates are the first given in the negotiating process. They are the one factor beyond negotiation. Water Power cannot withdraw them anymore than it can sell the Brooklyn Bridge." I find it very difficult to understand how you can have a negotiating—negotiations that are destined to lead to a contract that satisfies Water Power's needs to know that there is a reliable producer, when in fact Water Power withdraws the rates, sells Brooklyn Bridge and they'll never be a project.

Where this process failed and why there was never a meeting of the minds, was simply Water Power simply chose to walk out of the room, refused to offer the rates and negotiations, from that point on, from September, ended. What Empire was left with was doing everything it could under federal law and state law to perfect its right. Even though the rates remained in effect, the Commission did absolutely nothing to take that one given and keep it in place.

Quite ironically, three weeks after the rates were suspended, Water Power did send to Empire a contract. I believe that contract is attached in the form of Water Powers' new contract, is attached to Empire's brief. *Empire submits that if it had received an order similar to Afton, it would have reached a contract, would have had that contract, the size, and satisfy Water Power's need to know*

*that it will produce.* If it didn't produce under that contract, than that contract would provide Water Power the remedies and damages, the liquidated damages it needed to protect itself. Without the order, Water Power simply refused and as a consequence, there was no contract reached.

THE COURT: That contract that you've attached to your brief that Water Power sent three weeks after the January suspension, did it set the size of the plant and the location of the plant and those things?

MR. ORNDORFF: I believe it did Mr. Justice Bakes.

THE COURT: How did Water Power arrive at that. They didn't pick the source of the plant or the size. Was that the result of negotiations? How did that come about?

MR. ORNDORFF: Mr. Justice Bakes the record shows at the December 20, 1985 hearing, Water Power's Exhibit 102 was in fact Empire's contract that was presented to Water Power. Now, all of the relevant information that it subsequently used in presenting its contract was readily available. They had the QF notice, they certainly had the complaint. They knew the size and the location of the facility.

I think Counsel for Washington Water Power accurately stated what was going on with Washington Water Power. That is, they simply did not want to offer the existing rate to a QF. They declined on September 16th and they suspended the rates from September 16th, unlawfully as the Commission has stated, until January 14th, denying Empire a contract.

In addition to the summary given by Mr. Orndorff of what had been said at oral argument, I want to emphasize the close similarity of what was said by counsel for empire and for the commission in just the area of the import of the obtaining a QF certificate for Empire:

EMPIRE

MR. ORNDORFF: Mr. Justice Bakes, I think that you've picked up on the central issue that on rehearing that is in the brief, that the filing of the QF is a federal question and in looking at QF, does the QF naming the site and naming the size of the facility under the Federal Regulations and under PURPA entitle Empire to an offer to purchase from Washington Water Power at the then existing avoided cost.

THE COURT: Let me add one phrase to that. Even if, as a matter of fact, you haven't picked the site and haven't the size. Because, let's assume that, because the Commission found that. Now, let me add that to your question and say is that the legal issue of this case.

MR. ORNDORFF: That certainly is a legal question. I don't believe the record supports the Commission's findings that—

THE COURT: I agree that you disagree on that. But assuming that the record did, is that the legal question we've got to decide, whether that filing, that QF filing in October, setting out the site and the size is adequate to grandfather your rights in, even though, as the Commission found, wrongfully I know you argue, that you hadn't had a site picked and you didn't have a size picked?

MR. ORNDORFF: I believe that is true Mr. Justice Bakes.

COMMISSION

The Commission has the grant of power from 18 CRF 292, 401. That authorizes or empowers the Commission to issue regulations, to resolve disputes on a case by case basis and to engage in any other action reasonably designed to implement the regulation of sales and purchases between qualifying facilities and purchasing electric utilities.

Also of no small consequence is 292, 602(c)(2) which indicates that a qualifying facility is not exempted from state law and regulation in this particular field.

What are the guidelines and rules of implementation established by the Commission? The Commission requires that contracts be filed with it for review, approval and lock-in of effective rates. Alternatively, it requires that a complaint be filed with it wherein the qualifying facility establish facts which would show that it is otherwise entitled to a contract.

---

The interested reader who peruses the 1987 opinion for the Court will note a mention of Empire having been certified by FERC as a QF, and that it was for a 9.9 megawatt facility (at 193, 194, 755 P.2d at 1231, 1232), but also that there is no discussion whatever as to the legal status of the holder of QF certificate. In my view, the City of Kamiah brief explains very well the effect of having such a certificate. Certainly the comments of counsel, at oral argument last above excerpted, go a long way in fortifying the content of that brief.

On review of the opinion for the Court (at 194, 755 P.2d at 1232), it becomes evident that the whole appeal was turned away by a Chief Justice deeming too much. There is nothing which I can find in the pertinent authority which requires that QF status must be obtained prior to filing a complaint, and that to acquire it afterward

is fatal. It is known that a complaint serves to get the parties into court—so to speak—and the QF certificate is evidence at the hearing. Again I mention that the author of the Court's opinion is one of the *Afton* dissenters who has yet to embrace the rule of *Afton*—where he and Justice Bakes were clearly unable to correctly comprehend the purpose of PURPA—for which reason I find no substance in a holding which "deems it clear that the intent of PURPA is not to require an electric utility company to enter into a contract to purchase from an entity which only desires to obtain an option to sell some amount of electrical power to be generated at some plant of unknown size or capacity." *Id.*

As mentioned, the filing of a complaint brings the parties into the courtroom— even the mightiest. That is the true basic function of a complaint. When the parties

have clashed in court with their weapons of evidence, it is *then* that the law applied.

Since my interest was increased by my review of the deemed holding of the 1987 opinion, resort was had to the more successful *Afton* complaint, which is:

COMES NOW Afton Energy, Inc. hereafter referred to as "Afton" and for complaint against Idaho Power Co., Inc., hereafter referred to as "Idaho Power," alleges as follows:

### I

Afton is a corporation formed for the purpose of building, owning and operating a co-generation plant in Afton, Wyoming. The President of Afton is one Darrell M.P. Jones, hereafter referred to as "Jones." The co-generation plant is situated beside a large lumber mill in Afton and will use wood waste from surrounding national forests for fuel. The plant is 6.5 megawatts and will generate 52,000,000 kilowatt hours of electricity. The lumber mill is located within five miles of the Idaho State border and of the 300 employees who work at the lumber mill or in connection with its logging operations, more than one-half live and work (in the case of loggers) in Idaho.

### II

Idaho Power is a public utility headquartered in Boise, Idaho and subject to the jurisdiction and regulation of the Idaho Public Utility Commission, hereafter referred to as "Commission," Id. Code 61, Sec. 612.

### III

The Public Utility Regulatory Policy Act of 1978, hereafter referred to as "PURPA," delegates to the states and therefore, to the Commission, the rights and obligation to enforce the provision of PURPA. Accordingly, the Commission has established certain orders, in essence, obligate Idaho Power to purchase power from co-generation plants. Commission Orders 15746 and 16025.

### IV

In order to effect the purchase of power from Afton to Idaho Power, Jones has met with Idaho Power's officers from time to time over the last nine months. Initially, Idaho Power informed Jones that it would not purchase his power for the reason that Afton was not located within Idaho Power's service area. Subsequently, an opinion was secured by the FERC and the Commission establishing that Idaho Power was obligated to purchase the power as long as it would be delivered to their system. Jones was next informed by Idaho Power that he would need to first produce documentation that he could deliver the power to Idaho Power. Once this was secured (See attachments), Jones was informed that Idaho Power would still not purchase his power unless an order to do so was issued by the Commission. Subsequently, Idaho Power informed Jones that an application for that Order would be made within a few days, however, such application was never made despite the persistent requires by Jones for the same and the continued assurance by Idaho Power that it would be made within days.

### V

On this date, Jones was informed by Idaho Power the officers of the corporation had changed their minds and that Idaho Power will not submit an application to the Commission for the purchase of Afton's power for the reason that the power purchase rate was too high.

### VI

Afton alleges that Idaho Power has intentionally and deliberately protracted the negotiation for the purchase of its power. Despite frequent assurances by

Idaho Power that Afton is a good project and that Idaho Power stood willing to acquire its power, Idaho Power has in fact, continually employed delaying tactics designed to discourage Jones and destroy his efforts to complete the financing of this plant.

WHEREFORE, Afton hereby petitions the Commission to immediately order Idaho Power to enter into the attached Power Sales Agreement and to furthermore, cooperate in good faith and in an expeditious manner to consummate the sale of its power to Idaho Power.

DATED this 16 day of July, 1982.

AFTON ENERGY, INC.

By/s/ Darrell Jones
Darrell M.P. Jones,
President

A notice pleading in accordance with at least the Idaho rules of Civil Procedure, it brought Idaho Power to the PUC hearing room. It was here that Mr. Jones explained what had been done to him in his effort to be a small power producer or co-generator:[1]

My name is Darrell Jones. I'm president of a Company called—a newly formed corporation called Afton Energy, Inc. The address of that corporation is 1712 Pacific Avenue, Everett, Washington.

What I intend to do is just give kind of a narrative as to what has brought us to this point. I'd like to explain a little bit of the background of Afton and what it's attempted to do and then its involvement with Idaho Power and what we tried to accomplish there and then speak to what we'd like to see done, if possible, which is really, I guess, embodies our complaint.

Afton is located in Wyoming about five miles from the Idaho border. At Afton is a large lumber mill that produces primarily studs. I have an interest in that lumber mill as well as some other lumber mills in the Pacific Northwest. And for some time,

going back a couple of years, we have been interested in cogeneration. And it particularly applies in the Afton situation for the reason that—well, a couple of reasons. But the primary reason is of our proximity to the pulp and chip market. We're a long ways away.

And as a result of that, the hog fuel and chips and wood residues that are being developed at the mill have no market value. Presently they're dumped into two large 200–foot—two 200–foot burners, and that wood is just consumed. The flames lap out of the top of it sometimes 40, 50 feet high.

And that same fuel could be used as hog fuel for a cogeneration plant. So rather than burning it in these open burners, if you dropped it into a boiler and used the same quantity of residue, you would develop about 50 million kilowatt-hours a year of electricity. And so cogeneration becomes a very attractive alternative for that waste fuel in that area.

Afton is—although located in Wyoming, its primary trading area is out of the Idaho Falls area, as well as Pocatello. In addition to that, it's the—70 percent of all the timber that comes into the mill is developed out of Idaho. There's 130 employees at Afton, about half of whom live in Idaho, the other half who live in Afton. And there's another 200 employees who are involved in the logging operations. And just like the trees, about 75 percent of those people live and work in Idaho.

About, oh, I'd say 18 months ago, after completing a preliminary feasibility study on a cogeneration plant, we undertook serious negotiations with Lower Valley Power & Light, which is our local utility there, to ask them about buying our power under PURPA. And they weren't sure exactly what they could do or how they could do it, but that followed up with a discussion with BPA in Portland and then several meetings at Portland with BPA.

And it was explained to me that BPA is affected by the Northwest Power Act,

---

1. His testimony was in narrative form. Interruptions by way of question or comment have been omitted.

which in effect prohibits their local utilities from publishing avoided costs or releasing avoided costs that makes any economic sense in terms of building a cogeneration plant. Lower Valley Power & Light was disappointed because they understood the economic benefits to the community of having a cogeneration plant there.

In addition to that, they're at the tail end of a transmission system. And by having a cogeneration plant on line of this size, it would help steady the system. And so they were in favor of seeing the development of a cogeneration plant despite the fact that they didn't have the avoided costs that made any sense in terms of putting together a cogeneration plant.

But they did indicate that if there was some way that they could deliver our power out of their transmission system, that they would be willing to wheel it. And so in that connection, we began looking to a way that we could deliver our power. And we followed downstream from Lower Valley Power & Light to BPA's lines at Tincup, which is about 20 miles away. And there at Tincup, BPA picks up the lines and they run as a straight shot from there over to Goshen, Idaho. And at Goshen, the power comes into a substation where Idaho Power has the interconnect. Both Idaho Power and Utah Power & Light use that facility. In fact, it's a unified busing system. And both systems come in at that point.

So after talking with Lower Valley Power & Light and with some discussions with BPA, it looked reasonable as though we could achieve a wheeling arrangement. And in that connection, *I contacted Idaho Power. This was early in October of last year.*

I was directed to Don Barclay, and I spoke to Don about the prospects of our selling this power to them. And he said that they would entertain that possibility. *And then I requested they send to me their contract, and they sent their contract to me. I received that October 16th of last year.*

*I went through the contract.* There were a number of clauses in there that concerned me. Specifically, I was very concerned about the force majeure clause. It's not unusual for forest products companies to have strikes every four or five, six years; and it seems to me that the language in the force majeure clause was particularly hard on people who were going to have cogeneration plants and forest products companies.

And we went over that language. I had many conversations with Bart Kline, the attorney for Idaho Power, visited a little bit with Don Barclay on it.

There were a couple of other clauses we went over. Pretty well, after reviewing them, accepted the fact that Idaho Power was not going to—not willing to discuss any alterations or modifications. *That was their standard form contract, and you kind of took it as it is or you didn't take it.*

And so with that in mind and after another letter to Dave Meyers in October—dated October 22, whereupon I had asked him to clarify the pricing arrangement, in a later telephone conversation he was good enough to clarify that with me.

When that was all done in early November, I indicated I was prepared to sign the standard form contract and that *I wanted a meeting for the purpose of signing the contract.* And I at that point had called Mr. Barclay and informed him of that. And he said, well, he would get back to me on it.

He didn't get back to me on it. I called a couple of days later, and a meeting was set up at that time in his office with Bart Kline. He indicated in that conversation that they were somewhat concerned about how this cogeneration plant would be engineered and how it would work and they wanted to make sure that it was going to be a reliable and good source. And so in that connection, I had the contractor—Bumstad/Woolford—fly a representative from Seattle to Boise with me and—

It's Bumstad/Woolford. And they're a very large builder of cogeneration plants in California and they do a lot of work in the forest products industry. They're building the cogeneration plant or the boiler plant for Boise Cascade at Emmett now. Very responsible company and a very large company.

But in any event, we—I asked Bumstad/Woolford to send out a salesman, and they sent Fred Thiele with me. And we met—Don Barclay, Bart Kline and I met in Don's office, and we reviewed the contract.

At that meeting—I'm not really sure if it was that meeting or just prior to that meeting. It was just prior to that meeting. They informed me—Don—or Bart Kline informed me that the Company had met on this issue and had decided that as a matter of Company policy that they were not going to buy my power. And the reason why is because it was being wheeled and was not within their service district.

That was—I should back up. That was about two weeks earlier before this meeting with Don Barclay. And they said it was just a matter of Company policy and that they didn't intend to buy power that was being developed out of their service area.

This would have been probably late—early November to mid November. Yeah, it was.

· MR. McMAHON: 1981.

Uh-huh. They informed me—it was early November. They advised me that they wouldn't sign my contract because it was being wheeled. And I was disappointed. But I didn't understand PURPA, I didn't understand that that wasn't a choice that Idaho Power had. I was just discouraged and felt like I was kind of caught in between BPA's position relative to the Northwest Power Act and Idaho Power Company's decision they're not going to buy wheeled power.

Just a matter of days after that, I was visiting with another individual in the forest products industry; and they indicated that that wasn't the case, that in fact in California this issue had arisen and that the utility there was obligated to purchase power as long as it was delivered to their service area. And I picked up on that, called John Bryson, who's the president of the PUC in California. He advised me of the same thing, that that issue had arisen—had arisen in California and that that was the position in California.

However, he said he had no idea—or felt like that would be the case in Idaho, but he said he couldn't speak to that. And he suggested I call a Glenn Burger, who is with the Federal Energy Regulatory Commission in Washington, D.C. I called—

I talked to Mr. Burger. Mr. Burger confirmed what Mr. Bryson in California said, and that is that if you can deliver the power to their service area, that they are obligated under PURPA to purchase it. And he also indicated that he would like to be kept abreast of how this thing developed.

He also suggested that I call the Idaho PUC. And I did, and that was my first contact with the Idaho PUC. I talked to Jack McMahon, and he said that he would have some attorney review that in his office. And whereupon, Mike Gilmore researched it and prepared a legal memorandum. This is all in November.

'81. The legal opinion indicated the same thing that was said by Mr. Bryson in California and Mr. Burger at FERC. And whereupon, I—after receiving that opinion, I called Mr. Barclay. I advised him that I had received that opinion that the Company's position was wrong and that they were obligated to purchase my power.

Mr. Barclay sounded very upset that those steps were taken and upset that the opinion was developed without his knowledge of it. And again, he said that he would review it and that he'd get back to me.

He didn't get back to me. I called him, and it was at that time that he indicated that a meeting would be appropriate. And

at that time he also indicated—I'm backing up a little bit. But indicated it would be helpful if the engineers who were going to put the project together came.

We then came to Boise—this was early December—and met with Bart Kline and Don Barclay. We went over the plant and what it was going to do and the whole kind of layout of it.

And out of that meeting, Idaho Power requested that we do several things before they were willing to sign a contract. *They said that they would like a letter from the—to the Federal Energy Commission indicating that we had self-certified; they also indicated they wanted a letter from Wyoming indicating that Wyoming did not have jurisdiction; and then they indicated they also wanted letters from Lower Valley Power & Light, BPA and Utah Power & Light that the arrangement for delivering power to their system was going to be done.*

And I said I didn't feel like it was necessary to get all those letters, that it seemed to me their position wasn't going to be changed if they signed this contract and gave it to me now, whereupon the duty would be upon me to go out and get these letters. *And they said they would not sign and not give me a contract until those documents were in place.*

I also said that it would be helpful for me in order to secure financing to have that signed contract. And they said that they would not sign the contracts until they had those letters and that I would have to go about getting those letters and then they would talk to me. And I said okay, I'll just assume that everything's going to be okay and that we'll—*I'll in the meantime get those letters and arrange for financing.*

In the next couple, three or four months, I did that. I spent a tremendous amount of time—*I and other people involved in our company—consultants and* engineers and bankers and equity people spent a lot of time working on the financial arrangements for the cogeneration plant. All

along we assumed that the contract would be signed as it was presented, maybe with some modification for the interconnection, that certainly the pricing would stay the same, that there would be no problem with that.

From time to time, I checked with *Mr. Kline* and just to make sure that we were still running the same course. And he *assured me that we were, that when financing was arranged and the letters were secured that they would be in a position to go ahead and sign.*

This was January through April.

I received in May all the letters that were required. I had also at that time secured the financing on the plant.

I called Mr. Kline and indicated I am prepared to go ahead with the signature on the contract. And he indicated at that time that the Company would need to review the transmission agreement or wheeling agreement, that the letters weren't sufficient, and that they wanted to see a rough draft on that agreement.

Whereupon, I called BPA, indicated that we'd have to have a rough draft, and that within a couple of weeks they prepared a very rough draft of the proposed transmission agreement. And that was sent to Mr. Kline. And we are now moving into the end of May and the first of June.

In the first of June, after Mr. Kline had had the transmission agreement, he indicated to me that he had a vacation coming up and was kind of in the middle of this thing, but he had reviewed it preliminarily and thought it was okay. He did indicate that he'd have to check with the transmission department and possibly one other department, but that he couldn't see anything wrong with it.

While he was on vacation, I checked by telephone with two individuals at the Company. Their names I haven't gotten, but I can get later. And they both told me that the transmission agreement as they saw it, they saw no problems with it. However, they did indicate that there seemed to be a

concern on the part of the Company as to whether or not the Company was really going to sign my contract. And that is the first I had heard of that since last October, November. And I didn't pursue it. I just assumed that what Mr. Kline was telling me was the truth and that the Company stood ready to sign my contract.

When Mr. Kline returned from his vacation, he indicated that the transmission agreement again was okay, and that was verified by the two individuals that I had talked to while he was away. He did indicate that it was, however, a very bad timing on this project, that they were very busy with some work that they had and that it was his suggestion that I wait for a reasonable period of time before pushing this issue to a conclusion.

And I laid out, as I had done in a tentative way before, but I laid out in detail my financing plans. *I told him how critical it was that I move through and immediately consummate a contract with Idaho Power. And if I didn't, that I ran the risk of losing the* financing on the project, maybe indefinitely and more than likely permanently. And I told him that I didn't feel like I could wait until a later date.

And we talked about a date of July 15th as maybe a time when everything would be closed and done and the time that there wouldn't be any problems in getting the contract. And I said, If you could absolutely promise me that, then fine. And he said, No, I can't promise you that. And I said, Well, if that's the case, I've got to push you to see if we can't get this contract signed.

On or about June 30th, Mr. Kline advised me that Mr. Swisher and Mr. Jim Bruce had had a conversation relative to this issue and it was agreed that they would not buy the power without the order but that the order would be forthcoming, whereupon the contract would be delivered. And I asked about timing. He indicated the application would probably take a couple of days, whereupon the order would come, and within ten days—two weeks at the outside—we would have a contract. *I emphasized again how important my financing scheme was in order to get this thing accomplished, and I would appreciate it very much if he made the application for the order a top priority.*

The application was not forthcoming in a couple of days. I called and made a pest of myself, practically every day thereafter. I asked where it was and who's going to type it and talked to his secretaries about where it was. And it was typed a couple times and sent someplace, and it was always being shuffled around and somebody was looking at it.

And on July 16th, I called *Mr. Kline* again. And he *advised me that as of the previous morning at 10:00, July 15th, that in a meeting that was held by some* of the officers of the Company, that they had decided not *to buy my power again. And he said that it was not because it was wheeled,* that it was not because of any other problems with it. They recognized it was a very good project, *but that it was too expensive and that they didn't feel like the Company could afford that kind of a cost.*

And I became very upset with Mr. Kline on the telephone, and I told him I just can't understand this. You've been—*I've been led down the primrose path for nine months thinking all the time that the contract was forthcoming, and now I am advised among all the other problems that now the price isn't right.*

And I said, You've got to keep in mind that I've had a tremendous amount of reliance on this project, not only me but accountants and lawyers and bankers and equity people and engineers and permit people, and that I just couldn't understand how the Company could in good faith lead me along as though the contract was going to be signed for all this time and then throw this issue up. I told him that I wasn't sure exactly what my action would be, that I would just have to do whatever made the most sense. Whereupon, I decided the most appropriate action would be to

file a complaint, and the complaint has brought us to this hearing today.

I kind of wanted to mention a little bit on the extent of how far we had gone on the financing, relying on the assurances of the Company that a contract would be forthcoming.

On July 9th, there was a due diligence meeting for the equity offering of the ITC and ETC at our plant in Seattle, where attorneys—

There was a meeting with the underwriter who proposes to package and sell the equity in the plant—in the cogeneration plant to the public. That was called a due diligence meeting for the equity people. And that meeting was held in Seattle on July 9th.

We had in attendance four attorneys from New York, three attorneys from Seattle, we had accountants, bankers, the investment firm itself. In total, there was probably 15 people there. And it was all geared around, of course, the understanding that this project was a go and that the contract would be immediately forthcoming and that was the only loose end on the deal. And that's just evidence, I guess—further evidence of the extent of the work and reliance that we had had on this contract, it being delivered into our hands like it was promised so many times.

I believe that Afton has been severely damaged as a result of the procrastination and, I believe, the deliberate delay of Idaho Power in consummating this arrangement. I would estimate that our out-of-pocket expenses are approaching somewhere around $200,000. In addition to that, as has been made known by Idaho Power, the lost revenue in the cogeneration plant is about three and a half million dollars a year.

*I would like the Commission to order the Company to proceed with the contract that we had been relying on for some nine months, and that it be done* expeditiously, and that if there is any need to alter or change any terms in the contract that is attached—and I don't know of any

at this point—but if there is, that it be done in good faith on the part of Idaho Power.

All I'm saying is I'd like to request that the Commission order—I assume that's the appropriate remedy—Idaho Power to enter into the agreement that I have attached to the complaint. And if there is negotiations that need to be done to consummate anything that's in that contract—and I'm not aware of any—that if there is, that the Company do that in good faith.

There is language in that standard contract that allows for change, and I have never had any problems with that.

I'm saying that the Commission, as I understand it, has the power to change the contract, if public policy so says, at any time in the future. In addition to that, Mr. Ripley, as you are aware, a large portion of the contract price is flexible, is adjustable, as much as I understand, quarterly, depending upon what the energy rate may be. Only the capacity portion or capacity component of the contract is fixed. But regardless of that, both of them are capable of being changed by the Commission.

And if they didn't believe that, then there is no way that this plant could be financed. And I think that should be emphasized.

You know, all the time I get this feedback from Idaho Power that there's just no way that they can enter into these long-term agreements, despite the law. *But I wish they were in my shoes and tried to find—finance one of these cogeneration plants without some kind of assurances that the price is going to be relatively fixed for some long period of time.* You can't do it any other way. And if you had been in my shoes and tried to secure financing for the last year and a half on these projects, you would be a believer in my position.

We don't have any problem with the price structure under the existing contract. All we're asking is that we be given the benefit of that contract which was relied on for the last nine months.

I asked this. I said, I don't understand where Idaho Power is coming from. I said,

It just seems to me that it makes a lot more economic sense to enter into this contract than it does to go through all the involvement that you would have with what I understood would be the PUC on your rate case and

I'm a neophyte, I think, when it comes to the PUC and how it works and regulates industry. In fact, I didn't even call them until kind of a last resort, not knowing exactly what position they'd be relative to Idaho Power.

I've never gotten into the situation between PUC and Idaho Power. I am aware that a rate case has recently closed, and I've been reading in the paper, like anyone else. And I just assumed that there are some economic sanctions that can be applied if you, in bad faith, don't enter into— or in bad faith don't proceed with cogeneration contracts.

Well, I think that pretty well sums it up. I would like to emphasize, though, again the point that Mr. Ripley brought up, and that is, you know, although there are a number of contracts that have been let for cogeneration/hydroelectric in the state that I am aware of, that *very few are built and fewer yet are financed. And the reason why is because it becomes very, very difficult, if not impossible, to finance these things without a payment schedule something like what's in that standard form contract.* And without it, it makes my deal unworkable.

Thank you, Commissioners.

COMMISSIONER WARD: Okay, Mr. Jones. Just one question before we get to the attorneys. The contract you attached to your complaint is in fact the standard form contract.

THE WITNESS: It has some modifications that Bart Kline and I worked out relative to interconnection. Since it's going to be a power that's going to be scheduled to them as opposed to interconnecting with them, there is a lot of the—or a lot of paragraphs dealing with interconnection have been struck.

COMMISSIONER WARD: Right. And there's some background material on that attached to the filing.

THE WITNESS: Yes, that's right.

COMMISSIONER WARD: All right. And if Idaho Power were to sign that contract today, would you sign it?

THE WITNESS: You bet. Yesterday, the day before, anytime in the last year.

*       *       *

COMMISSIONER WARD: Mr. Jones, do you intend to present any other witnesses?

THE WITNESS: No.

COMMISSIONER WARD: I assume, since Mr. Ripley brought out you are an attorney, also you may want some argument after we hear from Mr. Ripley. But any further factual evidence whatever?

THE WITNESS: No. And I'd like to emphasize that although I am a member of the bar, I never practiced, never intended to practice. It was a matter of going to business school or going to law school, and I went to law school.

COMMISSIONER WARD: A very wise decision.

COMMISSIONER SWISHER: Well, Mr. Chairman, before you proceed, let one Commissioner express some concern.

Part of the allegation in that complaint and part of the testimony this morning is an assertion on the part of Mr. Jones, or Afton Energy, that the financing of the Afton project could be permanently and irreversibly lost because of the passage of time that he was outlining in his testimony this morning.

My concern, since you are a lawyer and since Mr. Ripley is too, and since Mr. Jones has never practiced law, that the patient needs to be allowed to live, not die on the table.

So if you want, I'll take a brief recess and allow you to talk to Mr. Kline and Mr. Barclay, if that would be helpful. But I don't think extended preparation is necessary.

Would you like a brief recess before cross?

MR. RIPLEY: Yes, I would, Mr. Chairman.

MR. McMAHON: Mr. Chairman?

COMMISSIONER WARD: Yes.

MR. McMAHON: Before we recess, could I ask a question?

COMMISSIONER WARD: Yes.

MR. McMAHON: Mr. Jones, in Idaho Power's response to your complaint, one of their concerns is that you may not be able to deliver this power for the 35–year contract. And my understanding is that concern goes to your Bonneville Power wheeling contract and a fear that Bonneville can cancel that at will, and therefore they'd be paying you on a 35–year basis and might only get three or four years' power out of that.

And could you talk about the location of your plant and how that whole wheeling thing works?

THE WITNESS: Yes. The plant would be located in Afton, Wyoming. And as I mentioned to you, the power would have to be wheeled from Afton to—or Lower Valley Power & Light's lines and then by Bonneville down to Goshen. And Bonneville prepared what —a standard form kind of contract that they apparently had used in other cases for such wheeling arrangements. And in that standard form contract there is a clause in there that indicates that BPA can give three-year notice of cancellation of the wheeling arrangement. That's kind of standard in most cases.

I have reviewed that with them. And they said, well, I guess two things. One of them is the likelihood of that happening is very, very remote because they can tell you ten years out now that they don't intend to develop any additional generating capacity on those lines that would cause them to bump our capacity that's being wheeled from Afton to Goshen. Plus, in addition to that, there is over 300 megawatts that are transmitted on those lines and we are putting into

about six and a half megawatts. And it becomes a fairly small percentage.

In addition to that, and probably most important, is that that's a theoretical calculation. It is not a practical calculation because in practice what will happen is the power will be generated in Afton, but it will never leave Afton. The Afton area is a consuming district. The power —all their power is purchased from Bonneville. It comes up to Bonneville and moves into their system. When we put Afton on line, it will generate power right in that vicinity that will be consumed in that vicinity and in practice will not move down those lines.

There's one other point. In discussions with them more recently, when I asked about that three-year limitation, they indicated that since this is a transmission line—large transmission lines where they have such long-term planning done on them as opposed to a local interconnect—I forget exactly what they call the other lines—but because it's transmission lines—large transmission lines, they can anticipate pretty well what the capacity is going to be running there on a long-term basis, that it may not even be necessary to have that three-year notice of termination in there.

And I think there's one other point, and that is that regardless of everything else I have said, Afton is willing to accept that and assume that as a risk. We have the duty to deliver the power to Idaho. We demonstrated that we can deliver it, and we assume that we will for the full 35 years. If for some reason we don't, there is recourse set up in the standard contract that I believe has been reviewed by the PUC and been blessed by Idaho Power and PUC. And I would assume that they would have the same right to using that language to come after Afton if for some reason it failed to deliver. I can't help but feel that from a practical standpoint that there is no way that that will happen.

The Afton complaint had attached to it the standard Idaho Power Company contract

which had been hammered out and approved as a result of those hearings which the commission conducted beginning in 1980 in its endeavor to set some procedures for compliance with the mandate of PURPA.

In defending against Afton, Idaho Power Company argued that the commission had no authority (jurisdiction) to order Idaho Power to sign its own tendered standard form agreement. The commission agreed, and in doing so made some comments much as counsel for the commission would later make at oral argument on the *Afton Energy* rehearing:

> In summary, Idaho Power's first affirmative defense is correct. The precise relief requested by Afton Energy, Inc.,—namely, that Idaho Power be ordered "to enter into the attached Power Sales Agreement"—is beyond the jurisdiction of this Commission to grant. The Commission, nonetheless, continues to endorse the practice of having available for public inspection standard form contracts that set forth the terms and conditions available to sponsors of typical projects, in the absence of circumstances that require individual negotiations on a site specific basis.

> Finally, while it is true that the Commission lacks jurisdiction to dictate contract terms between a utility and a qualifying facility, the Commission retains the authority (and, indeed, the duty) to require a utility to purchase power from a qualifying utility. "[A] state commission may comply with [§ 210's] requirements by issuing regulations, by resolving disputes on a case-by-case basis, or by taking any other action reasonably designed to give effect to FERC's rule." FERC v. Mississippi, 102 S.Ct. at 2133 footnote omitted. A utility cannot evade that requirement by inserting contract terms that are so ambiguous, or onerous, or unconscionable as to kill the project.

In concluding its written decision on hearing the complaint of Afton, the commission made some general comments which are appropriate to consideration in Empire's case:

> Some general comments are in order. First, we appreciate the fact that Idaho Power has done a thorough job of protecting the ratepayers by searching out and attempting to eliminate all risks associated with this project. *We trust, however, that the lengthy delay involved in completing that process will not become the accepted practice of dealing with cogenerators and small power producers. Such delay can irreversibly destroy the ability of some sponsors to obtain financing.* It is not an adequate answer to reply that key Company personnel have been busy with the general rate case. The cogeneration and small power program is here to stay. It is the Company's obligation to see that it is adequately staffed, if need by, with the full-time personnel.

And in the same instrument, Order No. 17478, issued its order to Idaho Power Company, which was, not to sign the contract, but to purchase co-generated power:

### ORDER

IT IS THEREFORE ORDERED that Idaho Power Company agree to purchase from Afton Energy, Inc., cogenerated power in the amount and for the time period tendered by Afton, at the avoided cost rates for Idaho Power Company that have previously been prescribed and approved by this Commission and that are currently in effect. Idaho Power must submit proof to the Commission Secretary that it has complied with this Order on or before the close of the business day on Monday, August 9, 1982.

DONE by Order of the Idaho Public Utilities Commission at Boise, Idaho, this 3rd day of August, 1982.

Counsel for Idaho Power's own remark is all that I have been able to find which serves as any kind of a basis for its comment at oral argument that the president

of Idaho Power, Mr. Bruce, had been threatened with jail if Idaho Power didn't sign the contract tendered by Afton. Idaho Power did sign it, but not under any threat other than that it was ordered to buy Afton's power. And in signing the contract it insisted on the paragraph which has brought us a new Afton sequel.

Taking a final look at the 1987 opinion for the Court, the quote from the *Boise Water Corp.* case (at 193, 755 P.2d at 1231) doesn't carry any weight when the reader is careful to note that it has to do only with findings which are binding on this Court because they emanate from the commission in a rate-increase case, which this case is not. Even in a rate-setting case, we are obliged to review the record and ascertain whether it sustains the findings. I do not disagree that commission findings ought to be given due respect in these PURPA cases which come before us—but I highly doubt that our Idaho constitution binds us unequivocally where we review commission cases which involve PURPA. Our oath of office involved the upholding of the Constitution of the United States as well as that of the State of Idaho. Accordingly, on a PURPA review we should ascertain whether the preemptive federal legislation has been faithfully adhered to.

In either event, however, on reviewing the *Afton I* record and comparing it to the Empire record, I am left with the compelling belief that the dilatory and procrastinating tactics of the two utilities are indistinguishable in grade of culpability and lack of good faith.

Empire's problem is that in *Afton I* the only issue fought out was the obligation of the commission to administer PURPA—for which reason none of us were aware of the facts of that case—only the law. Otherwise had we known the facts of *Afton I,* in Empire we would have seen that the two utilities were treating the two would-be co-generators equally—equally disdainfully and stand-offish.

Although Mr. Jones drafted his own *Afton I* complaint, in later proceedings Mr. Orndorff appeared, and a few years later represented and continues to represent Empire. He certainly had every reason to believe that what was seen as a just cause in *Afton I* would be regarded similarly in Empire's case.

I sincerely believe that, if the membership of this Court were to gather together for some communal record reading exercises, this case would be justly decided. As of now, it has not been.

Returning briefly to page 219, 755 P.2d page 1257, *supra,* and the discussion of the function of the filing of a complaint, it is interesting to note that the commission at one point in its March 3, 1986, order seemingly recognized that some requirements could be fulfilled while the case was before the commission. After reciting, R., 203, that "In most cases this will entail making a comprehensive binding offer, showing with reasonable specificity design and size characteristics and indicating a willingness to rely on proposed contract terms and proceed thereunder" the commission went on to declare that "In this case Empire has not complied with any of these requirements on or before January 14, 1986. Therefore it is not entitled to rates authorized by Order No. 18988 on July 6, 1984." Order No. 20281. The 14th of January was, I believe, the date on which Washington Water Power's then existing tariff of avoided cost rates would cease.

It is also noted in that same order that on December 19, 1985, Empire did make a comprehensive binding offer to Water Power, but watered that finding somewhat by adding that Empire did not indicate its willingness to completely bind itself. In regard to that the commission knew, but did not state, that there had been a stalemate over some terms that Water Power insisted on having in any contract, the primary one of which had to do with modification, and which was in Afton's case properly reserved by stipulation of the parties for future determination.

That same order stated that "nor had Empire even represented to Water Power

Case No. U–1008–190. This Order set the avoided cost rates that Washington Water Power Company (Water Power) was then obliged to offer cogenerators and small power producers (CSPP's) for purchased power. These rates have been in effect since July 6, 1984. Water Power did not ask for a rehearing in that case and did not file a case requesting revision of these rates until November 29, 1985. However, in September, 1985, Water Power informed potential CSPP's that it would no longer pay the avoided costs on file with the Commission. It is unclear whether Water Power was offering to pay a reduced rate to qualifying facilities or if it was merely implementing its own moratorium on interconnections until a new avoided cost was found by the Commission.

## II AVOIDED COST RATES ARE SET, SUSPENDED AND CHANGED ONLY BY THE REGULATORY COMMISSION, NOT BY THE UTILITY

It is clearly established under PURPA, state statutes, and case law that it is the jurisdiction of the state regulatory commission to set avoided costs under PURPA. In Afton III, the Idaho Supreme Court stated:

The Commission should apply the fair, just and reasonable standard, in a manner not inconsistent with federal law to the extent that it may be applicable, to determine whether the rates need to be adjusted in this particular type of contract.

*Afton Energy, Inc. v. Idaho Power Company*, 107 Idaho 781, 693 P.2d 427 (1984).

*Federal law gives to the regulatory commission jurisdiction not only to "resolve disputes"*, but also to set avoided cost rates. The wisdom and necessity of this grows out of the vastly unequal bargaining positions of the two contracting parties. This Commission recognized as much in the *Afton* case in Order No. 17609. In that case, as here, the utility was unwilling to sign a contract at tariffed avoided cost rates.

We are perfectly aware, of course, that Idaho Power Company is unhappy with the existing rates. We shall summarize here the holdings of prior orders regarding each of the utility's recently announced concerns. At the outset, however, it is important to note that Idaho Power is a classical monopolist. It is the sole distributor of electric power at the retail level throughout its service territory. Historically, monopolies abused this privilege by overcharging for their services; state legislatures responded by creating public service commissions to regulate the price that could be charged by a natural monopoly for delivery of its product.

Similarly, for many years, Idaho Power has been a monopsonist. It is the sole purchaser of electric power at the wholesale level throughout its service territory. Historically, monopsonists abused this privilege by using their bottleneck at the retail distribution level to underpay potential competing generators. The United States Congress responded to this situation by enacting the Public Utility Regulatory Policies Act. PURPA gives state regulatory commissions the power and imposes on them the duty to set competitive rates for the purchase of power by utilities from cogenerators and small power producers.

Order No. 17609, pg. 13.

*Due process is not met by a utility notification that filed avoided costs are no longer accurate, or as in the Afton case, "not in the public interest".* It is the Commission that takes the place of the market and ensures that after notice, hearing, argument and due consideration, that just, reasonable and non-discriminatory rates are set for the utility.

In Water Power's own avoided cost rate case (U–1008–190), extensive hearings were held and expert testimony was received not only from the utility and the Commission Staff, but numerous intervenors. After that hearing, the Commission made findings regarding Water Power's load/resource forecast, avoided cost rate components and levels, and other contract issues.

that it had decided that the project would be located at Kamiah.... Empire proposing to locate the project at either Weippe, St. Maries, or Kamiah." This is not born out by the record.

Order No. 20693, entered after rehearing, explained that interim rates had indeed issued on January 14, 1986, and that "Grandfathering under the –190 rates was made available to those cogenerators or small power producers (CSPPs) who had filed a complaint with the commission on or before January 13, 1986, and who were determined by this commission to be otherwise entitled ... to obtain such rates." R., pp. 274–275.

Inconsistently and inaccurately, too, the commission purported to find that Empire had not "committed itself with any reasonable specificity to project size and design characteristics."

Adding commission insult to Empire's injury at the hands of Water Power, that final order went on to say the sweetest words of all, what might have been:

> In this case, had Empire perfected its entitlement, the Commission would have viewed Water Power's representation of September 16, 1985 (indicating that its avoided cost rates had changed and that it was no longer willing to contract at the Schedule 62 avoided cost rates established in the –190 case) as evidence of bad faith on the part of the utility and would have ordered it to execute a contract at the then existing rates.

> For Water Power to continue to assert or infer that it is not bound to the avoided costs published in its tariff schedule, as it did in its brief on rehearing, is indefensible. This Commission will no longer countenance a utility position that asserts that by informing Empire that it would not contract on the basis of an obsolete albeit filed avoided cost as opposed to its self-determined but unfiled actual avoided costs it was doing little more than discharging its obligations and exercising its rights pursuant to the Public Utility Regulatory Policies Act (PURPA). R., p. 277.

The scolding handed thusly to Water Power was of little succor to Empire, which had been saying all along that Water Power had "stonewalled" its attempts to reach an agreement with the utility, "stonewalling" being a common term which appears earlier in this opinion.

The fault in the commission was in failing to recognize that when you are stopped dead in your tracks because your opponent will not meet with you, that's it—unless there is some relief to be had at the hands of some tribunal—in this case the commission.

The after-view of the commission, that it would have called "bad faith" on Water Power and "ordered it to execute a contract at the then existing rates" sounds great—BUT, on the other hand in *Afton* it specifically stated that it would not order the execution of a contract!! That was a major holding of its decision in that case.

The PUC staff apparently saw the circumstances in a much different light than did the commission. Staff participated at the December 20 hearing, and submitted a brief afterward which also touched on the issue of bad faith, or, conversely put, lack of good faith.

Before the Idaho Public
Utilities Commission

Empire Lumber Company, Complainant,

vs.

Washington Water Power
Company, Respondent.

Case No. U–1008–241

Brief of Commission Staff

Jan. 3, 1986.

COMES now the Staff of the Idaho Public Utilities Commission and files its brief according to the schedule outlined by the Commission at its hearing on December 20, 1985.

I FACTS

On March 21, 1984, the Idaho Public Utilities Commission issued Order No. 18744 in

The Staff points out that Water Power did not appeal the findings of the Commission in that case, nor did it file for new rates until November 29, 1985 after being directed to do so by Commission Order No. 19954.

It is the province of the Idaho Public Utilities Commission to set interim rates upon prima facie evidence brought by the utility showing an inaccurate avoided cost rate. See *Grindstone Butte Mutual Canal Company v. Idaho Power Company,* 98 Idaho 860, 574 P.2d 902 (1978). Unilateral action by Water Power, even in the form of a letter to potential cogenerators and small power producers, is a collateral attack on a final Commission Order and a clear violation of *Idaho Code* Section 61–625. It would be no more unreasonable for the utility to suspend its retail sales rates and set for itself new interim rates in lieu of filing a general rate case with the Commission.

Water Power could have, upon believing its avoided cost rates to be inadequate, filed for immediate interim rate relief with the Commission. If the Commission found it appropriate, a new interim avoided cost could be set expeditiously. This was recently accomplished by an Idaho Power Company motion of April 29, 1985. Within ten days of the motion, the Commission set an interim rate for the utility.

## III  UTILITIES ARE OBLIGATED TO PURCHASE POWER FROM QUALIFYING COGENERATORS AND SMALL POWER PRODUCERS

PURPA obliges each utility to purchase power from qualifying cogenerators and small power producers. Implementing this obligation and resolving disputes is left to each state regulatory body. See *FERC v. Mississippi,* 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982).

This is not the first case where a utility has attempted to suspend avoided cost rates or contract negotiations while ignoring due process, PURPA and state law. In *John H. Koyle vs. Idaho Power Company,* in that case, the Commission dealt with a remarkably similar action by a utility.

In short, Idaho Power Company now refuses to honor the rates that are approved and on file at the Commission as even the basis for commencing negotiations with cogenerators or small power producers. Such a defiance of final rate-making orders is unparalleled in the experience of this Commission. We remind Idaho Power Company that it is a regulated utility and that its announced Company policy in this matter makes it an outlaw—in that word's precise meaning of operating outside the law. The so-called "–200 rates" do not exist as a matter of law. They are simply a proposal put forward by Idaho Power without even a proposed effective date in a case that has not yet been heard.

\*    \*    \*    \*    \*    \*

It is unheard of for a regulated utility to charge for its services at rates other than those approved by and posted at the Public Utilities Commission. This is true even though the Company has filed for new rates and believes that its old rates are inadequate or even confiscatory. To unilaterally change rates that are charged for sales or rates that are paid for purchases is to wage a collateral attack on final Commission orders in the precise manner prohibited by *Idaho Code* § 61–625. Thus, the fact that on July 29, 1982, Idaho Power filed for revised avoided cost rates to be paid cogenerators and small power producers does not provide any justification for refusing to purchase power at rates that are now approved and on file.

Order 17796, pp. 4–5.

If avoided costs are inadequate, the proper avenue of relief is not through refusal to sign contracts, or do-it-yourself suspension of rates. The utility must file a case and request rate relief, even if for the interim. *The Commission should direct Washington Water Power to negotiate in good faith at the rates now approved and on*

*file.* Until such time as a hearing is held and new rates are set objectively and independently by the Idaho Public Utilities Commission, *the proper avoided cost must be adhered to by the utility and negotiated under in good faith.*

RESPECTFULLY submitted this 3rd day of January, 1986.

/s/ Jonathan M. Duke

Jonathan M. Duke

Deputy Attorney General

On Behalf of the Staff of the Idaho Public Utilities Commission

jmd/vs/92M

As I have said herein, a reading of the record does not sustain the commission's finding, as stated in Order No. 20693, "that at no time was Empire ready, willing and able to sign a contract with Water Power." *On that finding,* to use its own language, *"We based our decision on."* Where the finding is not substantiated, the decision cannot stand.

At the rehearing, the tenor of commission questions seem to indicate rather strongly that Commissioner High was at the command post in the writing of the first order. On the other hand, Commissioner Ward seemed to have been genuinely interested in seeing another cogenerator come on line:

Q BY COMMISSIONER WARD: Mr. Tyrer, suppose at the time—let's take the 1st of September date. Suppose on the 1st of September, Water Power had delivered to Empire Lumber Company a contract that had the standard rates then in effect for let's say 35 years. It also had—without the 4(c) language, but with the requirement for some sort of security provision and with the requirement of a size certain. Suppose say it stated the size. Let's say they stated 9 megawatts at Kamiah, and the other features which you object to such as continuing jurisdiction were in the contract, on September 1st you received that proposed contract, would you have signed or advised your client to sign?

A We would have signed a contract, but prior to signing it, we would have spent a few hours talking about the security requirements and I would have hoped to get the best security requirements as possible from my client's standpoint, but we would have worked the other issues out and that's what we had hoped to do at the September 16th meeting.

\* \* \* \* \* \*

Q BY COMMISSIONER HIGH: In effect, the evidence of hearing indicated that proper negotiation process had not taken place prior to the filing of the complaint and that the first seemingly true negotiation was the Empire offer to Washington Water Power to resolve many of the issues that had been in evidence on December 19th the day before the actual hearing on the complaint.

That's still true, isn't it?

A I don't believe that's true and I don't believe the evidence at the initial hearing showed that, Commissioner.

The contract negotiation is a matter of style and my style is to get the big issues out of the way and quickly get rid of the small ones. That's where we were going and that's what I was attempting to do.

Q Let's take them an issue at a time.

First, *the Order said that the output of the facility is still unknown.* You heard the testimony of Mr. Klaue. *Do you agree with his testimony on* that issue?

A The output of the facility—

Q Is still unknown. It will depend on what can be bought, and if I understand his testimony correctly, it might be anything up to 10 megawatts, up to the fuel supply.

A *The output of the facility is placed at 9.9. We applied for certification from FERC at 9.9 and that could vary slightly based on the availability of equipment, but not substantially.*

Q That's my understanding. The next item, it [the Order] says that *of prime importance* in our consideration of this

complaint *is the effort made by the Complainant in attempting to resolve contract disputes prior to filing the complaint.* And in the brief, there are, oh, eight or nine issues between the Company and—Empire and Washington Water Power.

*Isn't that a fact, that there was no real effort to resolve those disputes* prior to filing the complaint?

A There wasn't a real effort to resolve those contract clean-up types of issues. *There was a real effort to resolve the four issues which we mentioned in the complaint and that being the rate, the 4(c) language, security, and liability. Those were the issues in the complaint.*

We mentioned the other items at the hearing because the night before at the conclusion of our meeting with Washington Water Power *I said to Lester Bryan, "Did we agree on anything or should we take it to the Commission tomorrow?"*

And he said, *"Take it to the Commission."*

That's why we brought the other items in.

Q Okay, Mr. Tyrer, one last thing. If the Company had filed for 10.1 megawatts, the standard contract would have been perhaps not even a guideline. As you understand it from the Tariff 62 items, that standard contract would not apply and those issues we're talking about would be individually negotiated; is that right?

A That's true, but we made a decision for a slightly different reason although that was a factor. *Water Power advised us that the Washington PUC had some kind of formal or informal agreement or understanding that on facilities less than 10 megawatts they would not be as actively involved or as involved as they would be on facilities over 10 megawatts.*

Q And when you—

A *They were basically talking about a 10 megawatt facility and backed off to clear that obstacle.*

Q And when you made the decision in the Idaho jurisdiction to apply for 9.9, it put you under the Tariff 62 and—

A That was one of them.

Q —inherent in that is to begin with a standard contract.

A Right, that was one of the effects.

Q Now on the 4(c) issue, seemingly there are two issues there. One is future Commission actions, isn't that true?

A Right.

Q And the second issue is approval by the Washington Commission of any contract signed by the company?

A Right.

Q Let's take them separately. The future Commission action: *isn't it clear from past Commission orders,* a letter, clarifying letter from Commissioner Swisher and a multitude of orders, *that the Commission will not accept or require future Commission action being part of a contract?*

A It's certainly clear to me but apparently not understood by Washington Water Power.

Q Now the other issue, approval by the Washington Commission for ratemaking purposes. *Now isn't that a legitimate requirement by Water Power, or legitimate contract issue?*

A Well, that's a philosophical issue and *I just don't think the Washington PUC has any business in being involved in a review, approval, or any other part of a contract negotiated in Idaho with a utility under the jurisdiction of the Idaho PUC,* and I don't think you have any more business being involved in one in Washington, Montana, Utah, or any other place.

Q Well, here's the issue: A 10 megawatt plant represents a sizeable resource, and should that resource in Water Power's water supply be allocated only to Idaho or to the system—and you can see the effect on rates, can you not?

A I sure can and I think you have addressed that issue in the past, both on the Potlatch case and Kettle Falls.

Q And didn't we in those cases require a jurisdictional approach, total company interjurisdictional approach to this issue?

A I believe you did.

Q So based on past Commission actions, as you have indicated, the Washington Commission approval is a legitimate issue on the part of Water Power, is it not?

A Well, *based on the past Commission actions and that part of the 4(c) language, I have testified before and I will testify now, that is more philosophical than anything else.* The continuing jurisdiction is just a real issue that has to be resolved.

Q Let's not talk about continuing jurisdiction. I'm talking about the issue of Washington approval of these contracts for interjurisdictional—

A I understand the problems and the ratemaking and so forth—

COMMISSIONER HIGH: I have nothing further.

THE WITNESS: —and I'm not fighting that issue that much.

(Emphasis supplied.)

Earlier Mr. Tyrer testified as to negotiations with Water Power:

Q Mr. Tyrer, when Empire went to that September 16th, 1985 meeting, was it ready, willing and able to sign a contract with Water Power that would have permitted the construction of the project?

A We went to that meeting hopeful that we would be in that posture when we left and the 4(C) language was the hold-up initially.

Mr. Bryan informed me that he had turned it over to counsel for their consideration to see if it could be modified and that he'd let me know those findings.

That communication was never received from him, but following that discussion, *he said that they would not sign a contract at the approved rates.*

Q When did Empire Lumber Company first make a written contract proposal to Water Power?

A We made a written proposal in December, the day before the hearing on our complaint.

Q Why didn't Empire Lumber Company make a written proposal sooner?

A We were in hopes that at that meeting, the evening before the hearing, that we could resolve the issues outstanding and we prepared a contract for discussion purposes.

Q Did Water Power ever tell you that they would not sign a contract prepared by Empire?

A The initial meeting and at least one subsequent meeting they had informed me that they were—at the initial meeting, I offered to present a contract and they said that they had standard form contracts and they preferred to use those for their internal benefit of having a uniform-type contract. I agreed with them, that we would work within the framework of their contract.

Q You mentioned that you had negotiated a contract with Water Power previously. Was that, at that time, their standard form contract that you negotiated off?

A To the degree that they had one, yes.

Q Mr. Tyrer, in your opinion, was Empire Lumber Company engaged in active negotiations prior to September 23rd, 1985?

A They met with us and they discussed the issues but they gave no ground on the 4(c) language. I believe they were involved in active negotiations prior to then.

Q Mr. Tyrer, can you tell me what the size of the project is that Empire filed its Notice of Qualified Facility with the Federal Energy Regulatory Commission?

A 9.9 megawatts.

Q Have you researched fuel availability in the vicinity of the Empire project?

A Yes, I have.

Q When did you do that research?

A Well, my initial research was done before I agreed to work with Mr. Klaue.

I personally follow a procedure of qualifying my clients financially, credit-wise, a reputation in the industry, and availability for fuel for the project.

Q What were the conclusions of your research on fuel availability?

A The conclusions were that there was adequate fuel there for whatever size facility you want to build with upper limits of 50 to 60 megawatts.

Q How long do you think it would take Mr. Klaue to build his facility if he were to start in the near future?

A If we entered in a contract at the beginning of next week, six months for engineering and a year for construction.

Q Mr. Tyrer, has Washington Water Power contacted you concerning building the project since the Commission's March 4th 1986 order?

A No, they have not.

Q Mr. Tyrer, is it your opinion that prior to the September 16th, 1985 meeting that Empire had made substantial progress toward completion of the project?

A They certainly had.

Q Would you compare the progress Empire Lumber Company made towards its project with the progress Plummer made?

A Empire had done everything that Plummer had in preparation for a contract.

Q Mr. Tyrer, do you believe that Washington Water Power and Empire Lumber Company have a common interest in economic development in Northern Idaho?

A I sure do.

Q On Page 4 of the March 4th, 1985 opinion, Mr. Tyrer, the Commission requires that a CSPP must make every effort to negotiate a contract.

Is there any other effort you could have taken to obtain a contract which complied with PURPA prior to September 23rd, 1985?

A I know of no other effort. I have been involved in a number of negotiations with the utilities from Wisconsin to California, Washington, Wyoming, Montana, Idaho, and these negotiations were stopped by their refusal, stated refusal, to sign a contract at the approved rates.

MR. ORNDORFF: Mr. Chairman, that's all the questions I have.

On Mr. Tyrer's first examination there had been these pertinent questions and answers:

BY MR. ORNDORFF:

Q Mr. Tyrer, would you state your name and business address, please.

A Kenneth Tyrer, 885 Gossett Place, Boise, Idaho.

Q Are you the same Kenneth Tyrer who testified at the hearings held in this matter on December 20th, 1985?

A I am.

Q Is there anything in your testimony as given on December 20th, 1985 which you would like to change?

A No.

Q Would you review the assignment of Empire Lumber Company gave you in seeking to obtain a power sales agreement from the Washington Water Power?

A My assignment was to negotiate with Water Power for a power sales agreement and to develop the information necessary for that negotiation and make the decisions for the Empire Company people necessary to be made during those negotiations.

Q When did you first meet with Washington Water Power?

A Approximately August of 1984.

Q Did you have subsequent meetings?

A We had a number of subsequent meetings and they are a matter of record in the transcript of the earlier hearing on Pages 90 through 98.

Q Have you read the Commission's decision in this matter issued March 4th, 1986 denying Empire Lumber Company the benefits of the rates issued under Case U–1008–190?

A  Yes, I have.

Q  Do you believe that Empire Lumber Company exhausted every reasonable effort to obtain a contract from Water Power?

A  I believe we did.  Lester Bryan said that they absolutely would not sign a contract at the approved rates, and in over a year's time, Washington Water Power gave little ground on the 4(c) fixed rate, long-term contract language.

Q  When did Mr. Bryan tell you that he would not sign a contract at the existing rates?

A  September 16th, 1985.

Q  Mr. Tyrer, do you recall when Washington Water Power's rates were suspended?

A  The rates were suspended after that date.

Q  Do you recall when?

A  No, I don't.

Q  Mr. Tyrer, was there any action which you could have taken prior to filing the complaint in this case that would have resulted in Water Power signing a contract?

A  I'm unaware of any action.  They were willing to sign a contract with the 4(c) language early on and I recommended to my client that we not sign it because it was unacceptable.

Q  Why was the 4(c) language unacceptable?

A  It gave future Commissions, *both in Idaho and Washington,* jurisdiction over the contract so, in fact, you didn't have a contract.

Q  Mr. Tyrer, do you recall the exhibit that was entered in at the December 20th hearing that was a letter from Mr. Lester Bryan to you?

A  Yes, I do.

          *     *     *     *     *     *

Q  BY MR. ORNDORFF: Mr. Tyrer, do you recognize the letter that I just handed you?

A  Yes, I do.

Q  Could you briefly describe why the letter was sent to you?

A  The letter was sent to me because I had called Don Olson, the Senior Vice President of Washington Water Power—

COMMISSIONER SWISHER:  Would you move the mike up a little Mr. Tyrer.  You tend to be a crooner.

THE WITNESS:  —expressing my concern about the failure of negotiations to progress more rapidly towards a conclusion of the contract signing and also expressed my strong feelings that the 4(c) language was in violation of the Purpa regulation and contrary to orders of the Idaho PUC.

Q  BY MR. ORNDORFF: Turning to the second page of that letter, the last full paragraph, how did you interpret that paragraph with regard to the 4(c) language?

A  I interpreted that paragraph to mean that they were going to hold firm on 4(c) language and that we could either accept it or we could take a walk.

Q  I see, and what happened after you received this letter?

A  I arranged for future meetings with Mr. Bryan.  I met him here in Boise during a hearing for a brief period in the hallway and we had a meeting in Spokane in his office.

Q  And at any time, did Water Power, prior to the September 16th meeting that we've heard about today, decide that they would change their mind on Section 4(c) of their standard contract?

A  At no time prior to the September 16th meeting did they indicate—

COMMISSIONER WARD:  Louder, Mr. Tyrer.

THE WITNESS:  At no time prior to the September 16th meeting did they indicate a willingness to change.

Q  BY MR. ORNDORFF: Did you research whether Section 4(c) complied with PURPA?

A  I did.

Q  Do you have an opinion as to whether—

A   I have an opinion that it did not comply.

Q   What's that opinion based on?

A   It's based on reading the rules and regulations and discussions with a number of people who are actively involved in PURPA-type programs.

At this point, over Water Power's objection, Empire's Exhibit D was admitted into evidence. It consists of a letter dated August 5, 1985, which was that period of time when Empire believed that it was being stonewalled by Water Power in negotiating a contract. This letter goes a long way in establishing that it was Water Power's actions in keeping Empire at bay which resulted in the filing of a complaint:

August 5, 1985

### IDAHO PUBLIC UTILITIES COMMISSION
**STATEHOUSE**
**BOISE, IDAHO 83720**

PERRY SWISHER
PRESIDENT

JOHN V. EVANS
GOVERNOR

W. Lester Bryan
Vice President Power Supply
Washington Water Power Company
P.O. Box 3727
Spokane, WA 99220

Dear Les:

A July 29 letter from you to Mr. Ken Tyrer of Boise about your standard-form PURPA agreements may elicit a response from Mike Gilmore, head of our legal division.

Whether he takes it up now or in a more general forum, such as the next round on WWP co-generation, the Commission itself is concerned with the tack taken in recent months, because it contravenes our charge by the Congress.

You are properly concerned that the company and the ratepayer be protected by contract in the areas of expense recovery and liquidated damages. But you don't have authority, nor does a QF, to make this Commission a third party, in your contract, exercising "continuing jurisdiction" or making the contract subject to "future commission action" in a fashion that places a QF under continuous exposure to regulation of tarrifs, rates and charges.

Central to the PURPA act, to its language, to the Conference notes and to the federal case law since its enactment, is that QF's are not to be utilities. They can't be forced to submit themselves to the continuous rates-and-tariffs revision proceedings you and we live with for rate-of-return reasons. An applicant's willingness to allow the rate to fluctuate with agreed-to indices is quite another matter, but cannot include requiring future Commissions (or this one) to subject the rates in a given contract to continuing Commission review.

Very truly yours,

Perry Swisher

cc: Gilmore, Tyrer;
    Redmond;Ward, High

Mr. Tyrer's testimony continued with the letter at hand:

Q   BY MR. ORNDORFF: Mr. Tyrer, after you reviewed Exhibit 10, did you have any discussions with Washington Water Power?

A   I had two discussions. One was a discussion referred to that Lester Bryan

and I had in the hallway of the Commission and the other was in his office on September 16th.

Q I see. Prior to your meeting on September 16th, was there any other commission action which you were aware of that spoke to the issue of the 4(c) language?

A Yes, an order approving the Ford Contract and one other contract.

\* \* \* \* \* \*

Q BY MR. ORNDORFF: Is this the Commission order, Mr. Tyrer, that you were mentioning?

A Yes, it is.

Q Now, Mr. Tyrer, could you describe to us why Empire Lumber Company could not accept the 4(c) language?

A In my judgment, the 4(c) language would preclude long-term financing, even construction financing of the project. It would subject my client to an unreasonable degree of risk because the rates weren't fixed and the term wasn't fixed. It was subject to change by any future Commission, not only of Idaho, but also of Washington.

Q Mr. Tyrer, have you previously negotiated a contract for a qualified facility that has been built in the Water Power service area?

A Yes, I have.

Q What was that facility?

A Wood Power Inc., Plummer, Idaho.

Q Mr. Tyrer, did that contract have 4(c)–type language in it?

A No, it did not.

Q Did Water Power ever offer you an explanation why the 4(c) language wasn't in the Plummer contract?

A There explanation for the 4(c) language was that it would protect the company and ratepayers.

Q Now, at the meeting on September 16th, 1985—we've talked about 4(c). What were the other key issues that were raised at that meeting?

MR. STRONG: Mr. Chairman, I'm going to interpose an objection at this time.

I think most of this matter is already on the record and it seems to be unnecessarily repetitious.

COMMISSIONER SWISHER: Can you tell us why? The record of the first hearing is part of the record of this hearing.

MR. ORNDORFF: If I understand the Commission's order, one of the issues raised in the notice is the unilateral suspension of rates, and the Commission, as I interpret that, asked to hear additional testimony on that issue.

COMMISSIONER SWISHER: Yes.

MR. ORNDORFF: And that's the part I'm going after.

COMMISSIONER SWISHER: All right. So that is the issue and that's where you're headed?

MR. ORNDORFF: That is our position. That's when the unilateral suspension of the rates occurred.

COMMISSIONER SWISHER: All right, to that point, if that was an objection, Mr. Strong—

MR. STRONG: Yes, it was, Mr. Chairman.

COMMISSIONER SWISHER: Well, it's overruled.

Q BY MR. ORNDORFF: Mr. Tyrer, would you describe the other important issues that were discussed at the September 16th, 1985 meeting?

A The four issues that were discussed at that meeting of substance were the rate, the 4(c) language, the security clause, and an offer to consider Washington Water Power's preference for a site, an offer made in a spirit of cooperation, and we propose to them that if they had a preference for either St. Maries or Weippe over Kamiah, we would consider their preference before making—going forward with the project. They agreed to study it and respond. *There was never a response forthcoming from them.*

Q Were any of these issues resolved at that meeting.

A Nothing was resolved at that meeting.

Q *Can you tell us why nothing was resolved?*

A Mr. Bryan took the adamant position that he would not sign a contract at the approved rates. From my standpoint, negotiations ended. *You cannot negotiate when there's an adamant position on one party's side.*

Q Is there anything you could have done after September 16th, 1985 to obtain a contract at the then existing rates?

A I assumed that Mr. Bryan's position was the Company's position and he was firm on it because he certainly conveyed it in a very firm manner; there was nothing we could do.

Q Mr. Tyrer, when Empire went to that September 16th 1985 meeting, was it ready, willing and able to sign a contract with Water Power that would have permitted the construction of the project?

A We went to that meeting hopeful that we would be in that posture when we left and the 4(c) language was the hold-up initially.

Mr. Bryan informed me that he had turned it over to counsel for their consideration to see if it could be modified and that he'd let me know those findings.

That communication was never received from him, but following that discussion, *he said that they would not sign a contract at the approved rates.*

(Emphasis supplied).

Mr. Leighton testified for Empire. An employee of Potlatch Corporation, he does private consulting, and was retained by Empire to assist in the cogeneration project. He identified Water Power Exhibit 103 as the report of his evaluation of Empire's project. The report was dated September 17, 1984. His testimony:

Q Can you briefly summarize your recommendations in this report?

A Well, they're outlined on that same page, but essentially my recommendations to the owner were to get the facility qualified, which I believe has taken place, proceed by obtaining a contract with the appropriate utility, and then commence with all of the refinements of studies in obtaining the permits and so on.

Q Have you inspected the equipment that Mr. Klaue bought from the Crown Zellerbach, Twisp plant?

A Yes, I have.

Q Did you ever believe that Empire would be restricted by the size of the Twisp plant and the size that it eventually built its project?

A No, sir.

Q Why didn't you believe that the Twisp plant would restrict the size of the plant?

A Well, it was my understanding that the owner had purchased the Twisp plant as a potential portion of a complete cogenerating system.

Q In your study, Mr. Leighton, did you ever assume where the plant would be located?

A Yes, I did.

Q Where was that location?

A Kamiah.

Q Have you done a fuel study to determine if there is adequate wood waste available for the plant?

A I did a preliminary fuel study as part of this report that's before you.

Q Have you done any other research since you did this report in—

A I did not. I have obtained data from time to time from Mr. Klaue regarding how much fuel is being sold from the mills at Weippe, but I have not done any further study on it.

Q Mr. Leighton, do you have an opinion as to whether Empire was ready to build a project in 1985 if Water Power had offered Empire an acceptable contract?

A Yes.

Q What is that?

A I believe they were ready.

Commissioner High on cross-examination inquired of Mr. Leighton about the site selection, and the Twisp generator:

Q  And with respect to the site, I understand in our order we indicated the site determination was made in the process of negotiations, and your information indicates that that site might have been selected well in advance of the negotiations.

A  Mr. Klaue and I got together in the summer of 1984 and it was—I believe it was July or it was shortly after that time that we were zeroing in on Kamiah as to the most likely site.

Q  The existing plant the Company owns bought from Crown Zellerbach, when it was moved, or that portion of it was moved, where was it moved to?  Is it now located in Kamiah?

A  Most of it is located in Kamiah, however some of it is stored in Spokane. The turbine generator sets required a little better storage than there was facilities at Kamiah and that's being kept in Spokane.

Q  With respect to fuel supply, in our order we found that there was inadequate fuel supply and I think it wasn't based entirely upon your testimony, but also upon the testimony of Mr. Klaue. Do you confirm that?

A  Yes, I do.

Mr. August Klaue, president of Empire, was interrogated by Commissioner High as to what was wrong with the first order:

BY COMMISSIONER HIGH:

Q  I suppose the reason we're having a rehearing is because of the motion for reconsideration indicating that there were some errors in the Commission order and the Findings of Fact; is this your impression?

A  Yes, sir, I feel strongly that way.

Q  Could you define those areas in which the order was erroneous in terms of Findings of Fact?

A  I don't have the order in front of me and I didn't examine it before I came here, but I think one of them was that it was mentioned that we didn't have a site in mind, and we certainly had a site in mind all the way through this.  That was one of the big things.

Q  Well, I don't believe the order said that.

A  It seemed like it referred to—like I say, I don't have it here in front of me.  I can't go through it point by point.

Q  I do have the order and let's walk through it and maybe you can help me on this question.

On the site question, the order simply says that the site selection was made during the process of negotiations, that the site selection, in other words, was made sometime during that process.

One of the major items is that the output of the facility is still unknown. Was that an error?

A  No, we needed to have a contract to put all of our things together as far as output.  We didn't feel that—without a contract, you really can't go out and contract for additional waste from people when you don't have a contract.  There would be no point.  All you're doing is you're setting yourself up for a higher cost of your waste.  If you don't have a contract—if you go out and make a contract with somebody and don't have the contract, you're going to have to pay too much for it.

Naturally you need a contract before you can go out and get the waste, but the waste, the waste is no problem. There's plenty of waste.

Q  Let's go back to counsel's statement at the outset of the hearing that on September 16th, the Company was ready to sign a contract with Washington Water Power; is this, in fact, correct?

A  Yes.

Q  With respect to all the items, and I think there were eight or ten items in the Company's brief which indicates even at the time the brief was filed were subject to—you mentioned security and the concurrence of the Washington Commission was another.  There are many items in the brief which I believe was filed not too

long ago. There are still many items that the Company is not willing to sign; is that correct?

A That's right, but we would have signed if we could have gotten over those hurdles.

Q Now on this September 16th, this long list of items were a matter of controversy, were they not?

A Yes, they were.

Q You weren't ready to sign until those were—so on September 16th, the Company was not willing to sign a contract?

A Not on their terms.

Q Okay. Yeah. So the negotiation process you might say was underway to resolve those issues.

A Yes, sir.

Q And one issue—

A They weren't willing to give us a rate either so we couldn't really—

Q On September 16th, obviously that's the first time you apparently found from the Company that they were not willing to sign on the old rates?

A Well, it was very evident to me on September 16th that they weren't, yes.

Q I guess I'm trying to get this timing thing down. The Commission issued an order which required Idaho Power to file new rates and this order was issued September 6th. Now, you were aware of that order at least on September 16th?

A Mr. High, I would have to say you're getting me in a field of expertise that I'm not very good at. I would defer to Mr. Tyrer those questions, if you don't mind.

Q Fine, in other words, I should ask Mr. Tyrer these questions with respect to errors in the Commission order?

A Yes, sir. I would appreciate that.

Q One thing perhaps you can tell me, the power plant you bought from Crown Zellerbach, or indirectly—

A Yes, sir.

Q —is a 3.75 megawatt?

A Yes.

Q And I understand from your answers to cross that it's not your intention to utilize the plant as a primary plant for the Kamiah cogeneration?

A No. It's inadequate in its entirety, but there's equipment that we can use, possibly backup. We entertained having a backup system so that we're not shut down for a long period of time without any power. We can't stand penalties and this and that, so it's possible that we could use some of that equipment as a backup, the turbine generator or—I'm sure we'll get out value out of it some way or another.

Q Now respect to the 9.9 megawatt plant that's in your future, assuming you get a contract, do you have that plant under order or have you done preliminary work?

A I have asked Mr. Leighton from time to time, we have had plants come to our attention throughout this whole period that would utilize that capacity and we've investigated several opportunities. We haven't bought anything, naturally, because we don't have a contract. We don't want to expend any more money than we've expended.

Q Your intention is not to go out and buy new equipment at a very high price but instead to try and find existing equipment?

A Yes, we're going to look at all possibilities.

Q Have you located a single 10–megawatt plant anywhere?

A No.

Q Or have you located a 12–megawatt plant, for example, that could be scaled down?

A No, sir, we have not.

Q Or a 5–megawatt plant or two 5–megawatt plants?

A No. Actually, when our negotiations broke down—we really haven't researched that angle hard. We've got to have a contract before we go out and spend the time and money and effort to locate equipment, but they're out there, as I understand.

Q So the plant size essentially, if I understand—correct me if I'm wrong—are based on two things: One, to try to get a plant under the 10 megawatt which will allow you to qualify for a standard contract?

A Yes, sir.

Q And secondly, that you do have fuel supply adequate for up to a 10 megawatt plant?

A Very adequate.

Q And can I infer from that that you might put in any size plant up to 10 megawatts depending on what you locate?

A Depending on how the figures come out.

As my two opinions in this case reflect, I am fully persuaded that, as between *Afton* and *Empire,* justice was not evenly meted out by the commission. What was good for Afton is not necessarily going to be good for Empire. In my first opinion I ventured also, that the public weal was not served by a commission which moved Empire out of court when its only fault was trying to become a cogenerator in accordance with the congressional mandate—all because of frustration aimed at both parties—but which left Washington Water Power with no visible injury.